THE TRUSTEES OF THE OFFICE OF HAWAIIAN AFFAIRS, Plaintiff-Appellee, *v.* WAYNE J. YAMASAKI, individually, and in his official capacity as the Director of the Department of Transportation of the State of Hawaii, THE ALOHA TOWER DEVELOPMENT CORPORATION, SUSUMU ONO, individually, and in his official capacity as the Chairman of the Board of Land and Natural Resources of the Department of Land and Natural Resources of the State of Hawaii, TANY HONG, individually, and in his official capacity as the Attorney General of the State of Hawaii, and JENSEN HEE, individually, and in his official capacity as Director of Finance, Defendants-Appellants

NO. 11238

THE TRUSTEES OF THE OFFICE OF HAWAIIAN AFFAIRS, Plaintiff-Appellee, *v.* TANY S. HONG, in his official capacity as the Attorney General of the State of Hawaii, SUSUMU ONO, in his official capacity as Chairman of the Board of Land and Natural Resources, and JENSEN HEE, in his official capacity as Director of Finance, Defendants-Appellants

NO. 11246

■

MAY 27, 1987

LUM, C.J., NAKAMURA, PADGETT, HAYASHI, AND WAKATSUKI, JJ.

## OPINION OF THE COURT BY NAKAMURA, J.

The "governmental entity established by Article XII — Section 5 of the Constitution of the State of Hawaii,"[1] acting through its trustees, has instituted two actions in the Circuit Court of the First Circuit against several officers of the State and a public corporation, seeking declarations that the Office of Hawaiian Affairs (OHA) is entitled to receive twenty per cent of the income derived from certain lands held in trust by the State by virtue of state legislation implementing provisions of the act of Congress admitting Hawaii into the Union, as well as injunctive relief. The Trustees sued the Attorney General, the Chairman of the Board of Land and Natural Resources, and the Director of Finance in the first suit; they sued the foregoing officers, the Director of Transportation, and the Aloha Tower Development Corporation in the second. The defendants moved to dismiss the actions, raising the State's sovereign immunity and a purported lack of standing on the part of the Trustees. The circuit court denied the motions but allowed the defendants to seek interlocutory appellate review of its orders. Concluding that the Trustees are seeking judicial resolution of a

---

[1] Article XII, section 5 of the State Constitution, in pertinent part, reads:

There is hereby established an Office of Hawaiian Affairs. The Office of Hawaiian Affairs shall hold title to all the real and personal property now or hereafter set aside or conveyed to it which shall be held in trust for native Hawaiians and Hawaiians. There shall be a board of trustees for the Office of Hawaiian Affairs elected by qualified voters who are Hawaiians, as provided by law.

Hawaii Revised Statutes (HRS) § 10-4, in pertinent part, reads:

There shall be an office of Hawaiian affairs constituted as a body corporate which shall be a separate entity independent of the executive branch.

nonjusticiable controversy, we reverse the denial of the defendants' motions by the circuit court.

I.

The intra-governmental dispute the Trustees would have the courts decide involves the "public land trust," described in HRS § 10-3 and consisting of "ceded lands"; it is centered on the mandate of HRS § 10-13.5 that "[t]wenty per cent of all funds derived from the . . . trust . . . shall be expended by [OHA] for the purposes [set forth in HRS § 10-3]."[2]

---

[2] HRS § 10-3 reads:

Purpose of the office. The purposes of the office of Hawaiian affairs include:

(1) The betterment of conditions of native Hawaiians. A pro rata portion of all the funds derived from the public land trust shall be funded in an amount to be determined by the legislature for this purpose, and shall be held and used solely as a public trust for the betterment of the conditions of native Hawaiians. For the purpose of this chapter, the public land trust shall be all proceeds and income from the sale, lease, or other disposition of lands ceded to the United States by the Republic of Hawaii under the joint resolution of annexation, approved July 7, 1898 (30 Stat. 750), or acquired in exchange for lands so ceded, and conveyed to the State of Hawaii by virtue of section 5(b) of the Act of March 18, 1959 (73 Stat. 4, the Admissions Act), (excluding therefrom lands and all proceeds and income from the sale, lease, or disposition of lands defined as "available lands" by section 203 of the Hawaiian Homes Commission Act, 1920, as amended), and all proceeds and income from the sale, lease, or other disposition of lands retained by the United States under sections 5(c) and 5(d) of the Act of March 18, 1959, later conveyed to the State under section 5(e);

(2) The betterment of conditions of Hawaiians;

(3) Serving as the principal public agency in this State responsible for the performance, development, and coordination of programs and activities relating to native Hawaiians and Hawaiians; except that the Hawaiian Homes Commission Act, 1920, as amended, shall be administered by the Hawaiian homes commission;

(4) Assessing the policies and practices of other agencies impacting on native Hawaiians and Hawaiians, and conducting advocacy efforts for native Hawaiians and Hawaiians;

(5) Applying for, receiving, and disbursing, grants and donations from all sources for native Hawaiian and Hawaiian programs and services; and

(6) Serving as a receptacle for reparations.

## A.

The history of the trust begins with the cession of sovereignty by the Republic of Hawaii under the "Joint Resolution To provide for annexing the Hawaiian Islands to the United States," 30 Stat. 750, adopted by Congress on July 7, 1898. Along with sovereignty, the Republic "cede[d] and transfer[red] to the United States the absolute fee and ownership of all public, Government, or Crown lands . . . belonging to the Government of the Hawaiian Islands, together with every right and appurtenance thereunto appertaining[.]" *Id.* The resolution made "[t]he existing laws of the United States relative to public lands [inapplicable] to such lands in the Hawaiian Islands; but [stated] Congress . . . shall enact special laws for their management and disposition." *Id.* It further provided:

That all revenue from or proceeds of the [public lands], except as regards such part thereof as may be used or occupied for the civil, military, or naval purposes of the United States, or may be assigned for the use of the local government, shall be used solely for the benefit of the inhabitants of the Hawaiian Islands for educational and other public purposes.

*Id.* "The effect of [the foregoing language was] to subject the public lands in Hawaii to a special trust, limiting the revenue from or proceeds of the same to the uses of the inhabitants of the Hawaiian Islands for educational or other purposes." 22 Op. Att'y Gen. 574 (1899).

The joint resolution of annexation was followed by "An Act To provide a government for the Territory of Hawaii," 31 Stat. 141 (1900). And in section 91 of the Organic Act approved on April 30, 1900, Congress stated:

That the public property ceded and transferred to the United States by the Republic of Hawaii under the joint resolution of annexation, approved July seventh, eighteen hundred and ninety-eight, shall be and remain in the possession, use, and control of the government of the Territory of Hawaii, and shall be maintained, managed, and cared for by it, at its own expense, until otherwise provided for by Congress, or taken for the uses

and purposes of the United States by direction of the President or of the governor of Hawaii.

31 Stat. 159.

The advent of statehood compelled a restructuring of the ownership of Hawaii's public lands. Under section 5(a) of the Admission Act, Pub. L. No. 86-3, 73 Stat. 4 (1959), the State and its political subdivisions became the successors in title to the Territory and its political subdivisions in the lands held by the Territory and the counties. The following subsection granted the State title to the lands ceded to the United States upon annexation,[3] save those set aside pursuant to law for federal government use by any Act of Congress, Executive order, presidential proclamation, or proclamation of the Governor of Hawaii.[4] The United States, during the five-year period following admission, also was empowered to set aside for its continued use ceded lands it controlled at the time of admission under permit, license, or permission of the Territory.[5] Lands no longer needed were to be conveyed to the State at the close of the five-year period.[6]

The concept that the public lands of Hawaii were impressed with a special trust, implicit in the joint resolution of annexation, *see* 22 Op. Att'y Gen. 574, was reiterated in section 5(f) of the Admission Act. The congressional mandate in the subsection was that:

[t]he lands granted to the State of Hawaii by subsection (b) . . . and public lands retained by the United States under subsections (c) and (d) and later conveyed to the State under subsection (e), together with the proceeds from the sale or other disposition of any such lands and the income therefrom, shall be held by said State as a public trust for the support of the public schools and other public educational institutions, for the betterment of the conditions of native Hawaiians, as defined in the Hawaiian Homes Commission Act, 1920, as amended, for the

---

[3] *See* section 5(b) of the Admission Act.

[4] *See* section 5(c) of the Admission Act.

[5] *See* section 5(d) of the Admission Act.

[6] *See* section 5(e) of the Admission Act.

development of farm and home ownership on as widespread a basis as possible for the making of public improvements, and for the provision of lands for public use.

Congress further directed that

[the] lands, proceeds, and income shall be managed and disposed of for one or more of the foregoing purposes in such manner as the constitution and laws of said State may provide, and their use for any other object shall constitute a breach of trust for which suit may be brought by the United States.

### B.

Before 1978, the only references in the State Constitution to the trust created by section 5(f) of the Admission Act were to be found in article X, section 5 and article XIV, section 8 thereof.[7] The former restated an object of the trust in the words employed by Congress; it read:

The public lands shall be used for the development of farm and home ownership on as widespread a basis as possible, in accordance with procedures and limitations prescribed by law.

The latter placed the onus of compliance with the Admission Act on the legislature; it provided that

[a]ny trust provisions which the Congress shall impose, upon the admission of this State, in respect of the lands patented to the State by the United States or the proceeds and income therefrom, shall be complied with by appropriate legislation.

And the only legislation on the subject was HRS § 171-18, which essentially reiterated relevant provisions of the Admission Act.[8]

In the absence of more specific constitutional language and implementing legislation, public education became the primary

---

[7] Article X, section 5 has been renumbered; it is now article XI, section 10 of the State Constitution.

Article XIV, section 8 has also been renumbered; its provisions are now part of article XVI, section 7.

[8] HRS § 171-18 reads:

Public land trust. All funds derived from the sale or lease or other disposition of public lands shall be appropriated by the laws of the State; provided that all

beneficiary of the trust. "[T]he practice of the State of Hawaii before 1978 was to channel the proceeds and income of the lands included in the trust by and large to the Department of Education." Office of the Legislative Auditor, *Final Report on the Public Land Trust* 14 (1986). This was, of course, consistent with one of the objects of the trust, "the support of the public schools and other public educational institutions." But in 1978 the Constitutional Convention proposed and the voters of Hawaii adopted several constitutional amendments expressly directing the pursuit of other objectives.

Language "recit[ing] the trust corpus of Section 5(b) and nam[ing] the two principal beneficiaries established in Section 5(f) of the Admission Act — those [who are] native Hawaiians . . . and the general public[,]" was added to the State's fundamental law. Stand. Comm. Rep. No. 59, in 1 *Proceedings of the Constitutional Convention of Hawaii of 1978,* at 643-44 (1980) [hereinafter *1978 Proceedings*].[9]

---

proceeds and income from the sale, lease, or other disposition of lands ceded to the United States by the Republic of Hawaii under the joint resolution of annexation, approved July 7, 1898 (30 Stat. 750), or acquired in exchange for lands so ceded, and returned to the State of Hawaii by virtue of section 5(b) of the Act of March 18, 1959 (73 Stat. 6), and all proceeds and income from the sale, lease or other disposition of lands retained by the United States under sections 5(c) and 5(d) of the Act and later conveyed to the State under section 5(e) shall be held as a public trust for the support of the public schools and other public educational institutions, for the betterment of the conditions of native Hawaiians as defined in the Hawaiian Homes Commission Act, 1920, as amended, for the development of farm and home ownership on as widespread a basis as possible, for the making of public improvements, and for the provision of lands for public use.

[9] These provisions are found in Article XII, section 4, which reads:

The lands granted to the State of Hawaii by Section 5(b) of the Admission Act and pursuant to Article XVI, Section 7, of the State Constitution, excluding therefrom lands defined as "available lands" by Section 203 of the Hawaiian Homes Commission Act, 1920, as amended, shall be held by the State as a public trust for native Hawaiians and the general public.

The Convention's Committee on Hawaiian Affairs, which authored the language, offered this rationale for the proposal:

As a result of the revolution on January 17, 1893, the crown lands, which belonged to the Hawaiian people, were ceded by the Republic of Hawaii to the United States. These lands were conveyed back to the State on Hawaii's admission to the Union pursuant to Section 5(b) of the Admission Act. . . . [T]he Section 5(f) trust created two types of beneficiaries and several trust purposes one of which is native Hawaiians of one-half blood.

Stand. Comm. Rep. No. 59, in *1978 Proceedings,* at 644.

By virtue thereof, the ceded lands are "held by the State as a public trust for native Hawaiians and the general public." *See supra* note 9.

An Office of Hawaiian Affairs that would hold title to all the real and personal property set aside or conveyed to it, in trust for native Hawaiians and Hawaiians, also was proposed and established. *See supra* note 1. The framers intended OHA would be "independent from the executive branch and all other branches of government although [they contemplated that] it [would] assume the status of a state agency." Stand. Comm. Rep. No. 59, in *1978 Proceedings,* at 645. They expressed a concern that "in the past . . . commingling of funds intended for native Hawaiians of one-half blood with other moneys in the state treasury" had occurred. *Id.* OHA, they thought, would be the answer to such problems, would "provide Hawaiians the right to determine the priorities [that would] effectuate the betterment of their condition and welfare and promote the protection and preservation of the Hawaiian race," and would "unite Hawaiians as a people." Comm. of the Whole Rep. No. 13, in *1978 Proceedings,* at 1018. And the framers believed OHA should be "a receptacle for any funds, land or other resources earmarked for or belonging to native Hawaiians, and . . . a body that could formulate policy relating to all native Hawaiians and make decisions on the allocation of those assets belonging to [them]." Stand. Comm. Rep. No. 59, in *1978 Proceedings,* at 644.

Another amendment establishing OHA as a self-governing corporate body with a separately elected Board of Trustees was proposed by the Convention and accepted by the voters.[10] This amendment expressly empowered the Trustees "to administer and

---

[10] Article XII, section 6 of the State Constitution provides that

[t]he board of trustees of the Office of Hawaiian Affairs shall exercise power as provided by law: to manage and administer the proceeds from the sale or other disposition of the lands, natural resources, minerals and income derived from whatever sources for native Hawaiians and Hawaiians, including all income and proceeds from that pro rata portion of the trust referred to in section 4 of this article for native Hawaiians; to formulate policy relating to affairs of native Hawaiians and Hawaiians; and to exercise control over real and personal property set aside by state, federal or private sources and transferred to the board for native Hawaiians and Hawaiians. The board shall have the power to exercise control over the Office of Hawaiian Affairs through its executive officer, the administrator of the Office of Hawaiian Affairs, who shall be appointed by the board.

manage the pro rata share of assets derived from the public lands granted to . . . native Hawaiians . . . under Section 5(f) of the Admission Act." *Id.* at 646. Thus, the groundwork was laid for "appropriate legislation" implementing the trust provisions relating to native Hawaiians in section 5(f) of the Admission Act.[11]

## C.

The legislative response to the constitutional directives was Act 196, Session Laws of Hawaii 1979, now codified in HRS chapter 10. The legislature created "an office of Hawaiian affairs constituted as a body corporate which shall be a separate entity independent of the executive branch" as directed, described the powers and duties of the Board of Trustees in detail, and set forth the purposes of OHA. S.L.H. 1979, c 196, § 2.

Foremost among the goals to be pursued by OHA was "[t]he betterment of conditions of native Hawaiians." HRS § 10-3.[12] This purpose was singled out for special treatment, the legislature providing that a "pro rata portion of all the funds derived from the public land trust shall be funded in an amount to be determined by the legislature for this purpose, and shall be held and used solely as a public trust for the betterment of the conditions of native Hawaiians."[13] *See supra* note 2. And the powers given OHA included

---

[11] *See* article XVI, section 7 of the State Constitution.

[12] For purposes of HRS chapter 10,

"Native Hawaiian" means any descendant of not less than one-half part of the races inhabiting the Hawaiian Islands previous to 1778, as defined by the Hawaiian Homes Commission Act, 1920, as amended; provided that the term identically refers to the descendants of such blood quantum of such aboriginal peoples which exercised sovereignty and subsisted in the Hawaiian Islands in 1778 and which peoples thereafter continued to reside in Hawaii[.]

HRS § 10-2.
And

"Hawaiian" means any descendant of the aboriginal peoples inhabiting the Hawaiian Islands which exercised sovereignty and subsisted in the Hawaiian Islands in 1778, and which peoples thereafter have continued to reside in Hawaii[.]

*Id.*

[13] Although the "betterment of conditions of Hawaiians" is another OHA goal, the legislature provided no special funding for this purpose as it had for native Hawaiians.

those of managing, investing, and administering "all income and proceeds from that pro rata portion of the trust[.]" HRS § 10-5(1).

That the legislative action in 1979 did not represent the final word on the matter was clear from the language of the funding provision as well as the legislative history of Act 196. A committee report on the measure flatly stated "much must be left to subsequent legislatures, the Office of Hawaiian Affairs, and its board of trustees to work out the appropriate boundaries of the public trust." Stand. Comm. Rep. No. 784, in 1979 Senate Journal, at 1353.

In 1980 the legislature decided "[t]wenty per cent of all funds derived from the public land trust [would] be expended by [OHA] for the purposes of [HRS chapter 10]." S.L.H. 1980, c 273, § 1. But this too was not the final legislative word on OHA's pro rata share of funds from the trust. Two years later, the Legislative Auditor was directed: "(1) to complete the inventory of, (2) to study the numerous legal and fiscal issues relating to the use of and, (3) to study the use and distribution of revenues from ceded lands." S.L.H. 1982, c 121, § 1. The Auditor completed his study in December of 1986. His general conclusion with respect to the fiscal issues was: "Fiscal issues are difficult to identify until what precisely the Office of Hawaiian Affairs (OHA) is entitled to receive under HRS chapter 10 is clarified." *Final Report on the Public Land Trust, supra,* at 3.

### D.

OHA's trustees understandably were dissatisfied with the unsettled state of affairs regarding funds to be expended by OHA for the purposes outlined in HRS chapter 10. They felt the State was not allocating twenty per cent of all funds derived from the public land trust to OHA as required by HRS § 10-13.5.

On September 7, 1983, they filed a Complaint for Declaratory and Injunctive Relief against the Attorney General of the State, the Chairman of the Board of Land and Natural Resources, and the Director of Finance in their official capacities. The suit involves illegal sand-mining on what allegedly is "ceded land," royalty payments received by a private party, and land conveyed to the State in

lieu of damages.[14] The Trustees sought declarations by the circuit court that "OHA is entitled to receive 20% of the proceeds realized by the State of Hawaii from its disposition of sand from Papohaku Beach" and "a conveyance . . . of an undivided 20% interest in the land which constituted the proceeds from the disposition of Papohaku Beach sand." Alternatively, they sought "cash in an amount equal to 20% of the appraised value of the land received as proceeds from the disposition of [the] sand." And they prayed for a "mandatory injunction appropriate to implement [the court's] judgment."

On March 8, 1984, the Trustees filed a second Complaint for Declaratory and Injunctive Relief. The State officers sued were those who had been sued previously and the Director of Transportation. A government corporation, the Aloha Tower Development Corporation, was also named as a defendant. The primary relief requested was a declaration that "OHA is and has been entitled [since 1978 or 1979] to receive 20% of all of the income and proceeds" derived by the State from "sales, leases or other dispositions of [various] 5(f) Trust Lands." The lands designated in the pleading as "5(f) Trust Lands" from which income and proceeds were obtained by the State include lands surrounding harbors on all the major islands, land on Sand Island, land on which the Honolulu International Airport is situated, and land on which the Aloha Tower Complex stands. In addition, the Trustees sought manda-

---

[14] The gravamen of the suit is described as follows by counsel for the defendants:

The complaint, in essence, alleges that: (1) between 1958 and 1973, the State owned land at Papohaku Beach, which land was "ceded land"; (2) pursuant to a contract between Molokai Ranch and HC&D, Ltd., HC&D was allowed to mine sand from Papohaku Beach in exchange for royalty payments to Molokai Ranch; (3) as of June 30, 1973, Molokai Ranch received $1,279,006.00 in royalty payments; (4) in 1973, litigation was commenced relevant to Papohaku Beach in the Land Court of the State; (5) as a consequence of the decision in that case, the State sought damages for the sand taken from State property; and (6) in 1982, the State agreed to accept a conveyance of real property owned by Molokai Ranch (obviously not ceded land), of a value equal to $1,279,006.00, as damages resulting from the illegal sand mining operation.

OHA claimed that it was entitled to 20% of the damages the State recovered because Article XII, Sections 4 and 6 of the State Constitution . . . enacted in 1978, and Sections 10-3(1) and 10-13.5, HRS, . . . enacted in 1979 and 1980, respectively, mandate that OHA be given the sum requested.

The Attorney General rendered a legal opinion rejecting OHA's claim.

tory injunctive relief enforcing the requested declaratory judgment.

After submitting their responsive pleading, the defendants in the first case moved for judgment on the pleadings or for dismissal of the complaint on grounds that it stated no claim upon which relief could be granted because of the State's sovereign immunity and the plaintiffs' lack of standing to bring the action. The defendants in the second case, upon being served with copies of the complaint, promptly moved to dismiss the complaint on grounds that it stated no claim upon which relief could be granted because of the State's sovereign immunity and the plaintiffs' lack of standing to sue.

The cases were consolidated for purposes of hearing defendants' motions. The circuit court denied the motions but granted the defendants leave to seek interlocutory appellate review of its orders. We too have consolidated the cases for hearing and disposition.

## II.

The defendants urge on appeal, as they did earlier, that the doctrine of sovereign immunity bars an action for "recovery of money or land from the State" and "a government agency . . . cannot sue other government agencies for a money judgment."[15] In our view the circuit court's orders should be reversed, but not for the reasons urged. We are convinced the plaintiffs' claims are not of a nature cognizable by a court.

## A.

The framers of the United States Constitution, "in distributing the powers of [the federal] government, create[d] three distinct and separate departments — the legislative, the executive, and the judicial." *O'Donoghue v. United States,* 289 U.S. 516, 530 (1933).

---

[15] Appellants also raise another issue, that "sections 10-3(1) and 10-13.5, HRS, are invalid on their face as they fail to lawfully implement sections 4 and 6 of article XII of the State Constitution." In view of our ruling of nonjusticiability, we do not reach this issue.

They meant "to preclude a commingling of . . . essentially different powers of government in the same hands" and thereby prevent a situation where one department would be "controlled by, or subjected, directly or indirectly, to, the coercive influence of either of the other departments." *Id.; see also Humphrey's Executor v. United States,* 295 U.S. 602, 629-30 (1935).

But while the object was to "divid[e] and allocat[e] the sovereign power among three co-equal branches, . . . the separate powers were not intended to operate with absolute independence." *United States v. Nixon,* 418 U.S. 683, 707 (1974). The Constitution "contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635 (1952) (Jackson, J., concurring). The proper balance between the coordinate branches, therefore, is a delicate one; and "[t]he question of how far a judicial inquiry should range has been the most extensive and central debate in constitutional law throughout our country's history." K. Ripple, *Constitutional Litigation* § 3-1, at 87 (1984).

"[T]he judicial power of federal courts is . . . restricted [by article III of the Constitution] to 'cases' and 'controversies.' "[16] *Flast v. Cohen,* 392 U.S. 83, 94 (1968). "Embodied in [these] words . . . are two complementary but somewhat different limitations." *Id.* at 94-95. They serve in part to "limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process." *Id.* at 95. And they "define the role assigned to the judiciary in a tripartite allocation of power to assure that the . . . courts will not intrude into areas committed to the other branches of government.

---

[16] United States Constitution, article III, section 2 reads:

The Judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority; — to all Cases affecting Ambassadors, other public Ministers and Consuls; — to all Cases of admiralty and maritime Jurisdiction; — to Controversies to which the United States shall be a Party; to Controversies between two or more States; — between a State and Citizens of another State; — between Citizens of different States; — between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

Justiciability is the term of art employed to give expression to this dual limitation[.]" *Id.*

The term, however, describes "a concept of uncertain meaning and scope." *Id.* It is "not a legal concept with a fixed content or susceptible of scientific verification. Its utilization is the resultant of many subtle pressures . . . ." *Poe v. Ullman,* 367 U.S. 497, 508 (1961). Moreover, the uncertainty surrounding its application has been heightened because justiciability "has become a blend of constitutional requirements and policy considerations." *Flast v. Cohen,* 392 U.S. at 97. Truly, it "can be viewed from many different perspectives.

> When the focus is on the ability of a particular party to litigate adequately a particular issue (and thus preserve the adversary process), the courts address the problem in terms of 'standing.' When the litigation seems premature or subject to unresolved contingencies, the courts speak of the justiciability question in terms of 'ripeness.' When the continued vitality of the law suit is questionable, 'mootness' is the label used to describe the justiciability problem. Finally, when resolution of the litigation threatens confrontation with the other parts of the government, the courts speak in terms of 'political question.' "

K. Ripple, *supra,* § 3-2(A), at 88.

"The political question doctrine is certainly the most amorphous aspect of justiciability." *Id.* § 3-7, at 96. "Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed," the Supreme Court has said, "is itself a delicate exercise in constitutional interpretation, and is a responsibility of [the] Court as ultimate interpreter of the Constitution." *Baker v. Carr,* 369 U.S. 186, 211 (1962). The Court further cautions that a case should not be dismissed on the ground that it involves a political question without "discriminating inquiry into the precise facts and posture of the particular case." *Id.* at 217.

Whether a political question is present or not is "impossib[le] of resolution by any semantic cataloguing." *Id.* Still,

> [i]t is apparent that several formulations which vary slightly according to the settings in which the questions arise may de-

scribe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question's presence.

*Id.*

### B.

Unlike the federal judiciary, "the courts of Hawaii are not subject to a 'cases or controversies' limitation like that imposed . . . by Article III, § 2 of the United States Constitution." *Life of the Land v. Land Use Commission,* 63 Haw. 166, 171, 623 P.2d 431, 438 (1981); *see also State v. Fields,* 67 Haw. 268, 274, 686 P.2d 1379, 1385 (1984).[17] But like the federal government, ours is one in which the

---

[17] The section of the Hawaii Constitution vesting judicial power in the several courts of the State reads:

The judicial power of the State shall be vested in one supreme court, one intermediate appellate court, circuit courts, district courts and in such other courts as the legislature may from time to time establish. The several courts shall have original and appellate jurisdiction as provided by law and shall establish time limits for disposition of cases in accordance with their rules.

Haw. Const. art. VI, § 1. Noteworthy is the lack of a reference to "cases or controversies."

Indeed, "[t]he case-or-controversy requirement . . . relates only to the jurisdiction of [federal courts] and has no bearing on the jurisdiction of the [state] courts." *Secretary of State of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 970-71 (1984)

sovereign power is divided and allocated among three co-equal branches. *See* Haw. Const. art. III, art. V, and art. VI.[18] Thus, we have taken the teachings of the Supreme Court to heart and adhered to the doctrine that the use of "judicial power to resolve public disputes in a system of government where there is a separation of powers should be limited to those questions capable of judicial resolution and presented in an adversary context." *Life of the Land v. Land Use Commission,* 63 Haw. at 171-72, 623 P.2d at 438 (citing *Reliable Collection Agency, Ltd. v. Cole,* 59 Haw. 503, 510, 584 P.2d 107, 111 (1978)). And, we have admonished our judges that "even in the absence of constitutional restrictions, [they must] still carefully weigh the wisdom, efficacy, and timeliness of an exercise of their power before acting, especially where there may be an intrusion into areas committed to other branches of government." *Life of the Land v. Land Use Commission,* 63 Haw. at 172, 623 P.2d at 438.

Our guideposts for the application of the rules of "judicial self-governance 'founded in concern about the proper — and properly limited — role of courts in a democratic society,' " *id.* (quoting *Warth v. Seldin,* 422 U.S. 490, 498 (1975) ), reflect the precepts enunciated by the Supreme Court. When confronted with an abstract or hypothetical question, we have addressed the problem in terms of a prohibition against rendering "advisory opinions," *see State v. Fields,* 67 Haw. at 274, 686 P.2d at 1385; when asked to decide whether a litigant is asserting "legally recognized interests, personal and peculiar to [him]," we have spoken of "standing," *Life of the Land v. Land Use Commission,* 63 Haw. at 172, 623 P.2d at 438;

---

(Stevens, J., concurring). Therefore, while the Supreme Court "may require federal courts to follow [justiciability] rules, [it] ha[s] no power to impose them on state courts." *Id.* at 972. "[State] judges may, of course, elect to follow [the Supreme Court's] example, but there is no reason why they must do so." *Id.*

[18] Hawaii Constitution, article III, section 1 reads:
The legislative power of the State shall be vested in a legislature, which shall consist of two houses, a senate and a house of representatives. Such power shall extend to all rightful subjects of legislation not inconsistent with this constitution or the Constitution of the United States.

Hawaii Constitution, article V, section 1 reads in part:
The executive power of the State shall be vested in a governor.

And Hawaii Constitution, article VI, section 1 vests the judicial power of the State in the several courts. *See supra* note 17.

when a later decision appeared more appropriate, we have re-solved the justiciability question in terms of "ripeness," *State v. Fields*, 67 Haw. at 274-75, 686 P.2d at 1385; and when the contin-ued vitality of the suit was questionable, we have invoked the "mootness" bar, *Wong v. Board of Regents*, 62 Haw. 391, 394, 616 P.2d 201, 203-04 (1980).

We have also followed the teachings of the Supreme Court where "political questions" are concerned. Our decisions, like those of the Court, display somewhat amorphous characteristics. To begin with, we have said that "[w]ithin the framework of the fun-damental doctrine respecting the separation of powers of govern-ment, some flexibility must be infused." *Koike v. Board of Water Supply*, 44 Haw. 100, 114, 352 P.2d 835, 843 (1960); *see also Akahane v. Fasi*, 58 Haw. 74, 82, 565 P.2d 552, 558 (1977). But we have recognized "the inappropriateness of judicial intrusion into matters which concern the political branch of government." *Bulgo v. County of Maui*, 50 Haw. 51, 56, 430 P.2d 321, 325 (1967). And we have observed that "[t]oo often, courts in their zeal to safeguard their prerogatives overlook the pitfalls of their own trespass on legisla-tive functions." *Koike v. Board of Water Supply*, 44 Haw. at 103, 352 P.2d at 838.

### III.

Having reviewed justiciability in its several aspects, we turn to the task at hand, that of deciding whether judicial intervention in the disputes described by the plaintiffs would be wise.

### A.

The plaintiffs, in essence, have asked the circuit court to rule that the Attorney General of the State, the directors of several departments of the State government, and a government corpora-tion are misreading and misapplying HRS § 10-13.5 and to order that some funds controlled by those departments and the corpora-tion be turned over to OHA. Inasmuch as section 10-13.5 simply states "[t]wenty per cent of all funds derived from the public land trust, described in section 10-3, shall be expended by the office, as defined in section 10-2, for the purposes of this chapter[,]" the task

at first sight appears to be one of statutory interpretation. But a closer look at the disputes reveals they do not constitute traditional fare for the judiciary; and if the circuit court ruled on them, it would be intruding in an area committed to the legislature. It would be encroaching on legislative turf because the seemingly clear language of HRS § 10-13.5 actually provides no "judicially discoverable and manageable standards" for resolving the disputes and they cannot be decided without "initial policy determination[s] of a kind clearly for nonjudicial discretion." *Baker v. Carr,* 369 U.S. at 217.

When the constitutional mandate for the establishment of a government agency with a primary goal of "the betterment of the conditions of native Hawaiians" was implemented in 1979, the legislature acknowledged that "much [was] left to subsequent legislatures, the Office of Hawaiian Affairs, and its board of trustees to work out the appropriate boundaries of the public trust." Stand. Comm. Rep. No. 784, in 1979 Senate Journal, at 1353. A year later, when OHA's share of funds from the trust was fixed at twenty per cent, its "boundaries" were still undetermined.

That "the appropriate boundaries of the . . . trust" were not set was confirmed by the enactment of legislation with a purpose of providing funds "(1) to complete the inventory of, (2) to study the numerous legal and fiscal issues relating to the use of and, (3) to study the use and distribution of revenues from ceded lands." S.L.H. 1982, c 121, § 1. The legislative committee reports accompanying the measure are even more revealing. All four committees to which the bill was referred for study found there were uncertainties with respect to the ceded lands comprising the trust res and the funds derived therefrom. The committees concluded

> that the many uncertainties surrounding the matter of ceded lands and the disposition of revenues generated by the use of ceded lands can best be resolved by ascertaining what and where ceded lands exist, the legal and fiscal problems which may exist or arise from their use, and the effect on all parties concerned with the use and distribution of revenues generated from ceded lands.

Stand. Comm. Rep. No. 396, in 1982 House Journal, at 1061; Stand. Comm. Rep. No. 663, in 1982 House Journal, at 1200;

Stand. Comm. Rep. No. 565, in 1982 Senate Journal, at 1190; Stand. Comm. Rep. No. 768, in 1982 Senate Journal, at 1279. Hence, they recommended the appropriation of $100,000 to the Legislative Auditor for the project.

The Auditor undertook the assigned tasks after the close of the legislative session. He submitted a progress report in 1983, reporting that the tasks had not been completed because "the work . . . is enormous." Legislative Auditor of the State of Hawaii, *Progress Report on the Public Land Trust* 1 (1983). In his final report issued in December of 1986 the Auditor states the tasks were more difficult than envisioned and the uncertainties surrounding the trust and funds derived therefrom cannot be resolved without further legislative action.[19] Our inquiry into the facts and posture of the two controversies the plaintiffs would have the circuit court decide leads us to a similar conclusion.

### B.

The pleadings in the first case disclose that the Trustees are seeking twenty per cent of what the State received as damages for the illegal mining of sand from Papohaku Beach on Molokai. Granted, the makai or seaward boundary of real property abutting the ocean "is the high water mark that is along the edge of vegetation or the line of debris left by the wash of waves during ordinary high tide," *In re Ashford,* 50 Haw. 314, 315, 440 P.2d 76, 77 (1968), and Papohaku Beach, therefore, is part of Hawaii's public domain. Yet nothing in HRS § 10-3, where the public land trust is described, serves as a statutory base for a ruling that such damages are funds derived from the public land trust or that a pro rata portion of the land conveyed to the State in lieu of the damages should in turn be conveyed to the Trustees of OHA. Either ruling would be rendered possible only by an initial policy determination by the court

---

[19] A statement in the Auditor's final report about OHA's entitlement to funds reads:

We deal extensively in this report with the issue of OHA's entitlement and recommend legislative solution of the issue.

*Final Report on the Public Land Trust, supra,* at 3.

of a kind normally reserved for nonjudicial discretion. *See Baker v. Carr,* 369 U.S. at 217.

In the second case, the Trustees pray for a declaration that OHA is entitled to its pro rata share of the income and proceeds from sales, leases, or other disposition of lands surrounding harbors on all the major islands, of land on Sand Island, of land on which the State's major airport is located, and of land on which the Aloha Tower complex stands. They would have the circuit court apply HRS § 10-13.5 literally and declare that OHA should receive twenty per cent of the revenues generated through the use of the foregoing lands, which concededly are part of the trust res. A ruling to that effect, however, would be at odds with legislative commitments relative to such revenues.

The construction of the State's harbors and airports is primarily financed through the sale of bonds which carry the State's pledge that revenues obtained from their operation shall be employed to repay bondholders. These pledges are supported by legislation establishing special fund· to meet the State's obligations. For example, HRS § 261-5 directs that "[a]ll moneys received by the department of transportation from rents, fees and other charges [from airport operations and] aviation fuel taxes . . . shall be paid into the airport revenue fund" and "[a]ll such moneys . . . shall be expended by the department for the statewide system of airports[.]"

Were the circuit court to enjoin the Director of Transportation as prayed by the Trustees, he would be compelled to renege on the State's pledge. It would be unrealistic, to say the least, for us to conclude this could have been the intent of the legislature when the language of HRS § 10-13.5 was adopted. Yet, we have found no "judicially discoverable and manageable standards" that could be employed to resolve the conflict between the mandates of HRS §§ 10-13.5 and 261-5. *See Baker v. Carr,* 369 U.S. at 217. Both are couched in all-inclusive terms; surely, one or the other is not meant to be read literally. In the view of the Legislative Auditor, it is what OHA "is entitled to receive under HRS chapter 10 [that must be] clarified." *Final Report on the Public Land Trust, supra,* at 3.

Our inquiry into the facts and postures of the two cases revealing the issues "to be of a peculiarly political nature and therefore not meet for judicial determination," *Colegrove v. Green,* 328 U.S. 549, 552 (1946), we reverse the circuit court and remand the cases

for the entry of appropriate orders.

*Terence S. Yamamoto,* Deputy Attorney General, for appellants.

*Boyce R. Brown, Jr. (Brown & Durant,* of counsel) and *Jerel D. Fonseca (Schutter, Playdon, Glickstein,* of counsel; with them on the briefs: *David C. Schutter* and *Stacy Moniz)* for appellee.

On the brief for Amicus Curiae Honolulu Airlines Committee: *William C. McCorriston (Goodsill, Anderson; Quinn & Stifel,* of counsel).