**BOARD OF EDUCATION** of the State of Hawaii; and **DARROW AIONA, MAKO ARAKI, RONALD NAKANO, CHARLES NORWOOD, WILLIAM WATERS, MICHAEL MATSUDA, JOHN PENEBACKER, HATSUKO KAWAHARA**, and **RANDALL YOSHIDA**, individually and as members of said Board; and the **HAWAII STATE TEACHERS ASSOCIATION**, Plaintiffs–Appellants, v. **JOHN WAIHEE**, Governor, and **YUKIO TAKEMOTO**, Director of the Department of Budget and Finance, State of Hawaii, Defendants–Appellees

NO. 12877

(CIV. NO. 85–4226)

FEBRUARY 10, 1989

LUM, C.J., NAKAMURA, PADGETT, HAYASHI, AND WAKATSUKI, JJ.

254

## OPINION OF THE COURT BY NAKAMURA, J.

The Circuit Court of the First Circuit dismissed the action for declaratory and injunctive relief brought by the Board of Education (the Board), some of its members suing individually, and the Hawaii State Teachers Association (HSTA)[1] against the Governor and the Director of the Department of Budget and Finance on the ground that the case involved nonjusticiable "political questions." Reviewing the record on appeal, we conclude the intra–executive branch disputes described in the plaintiffs' amended complaint are capable of judicial resolution. But we further conclude the defendants are entitled to judgment as a matter of law, and we remand the case to the circuit court for entry of an appropriate judgment.

### I.

### A.

The Governor, in whom "[t]he executive power of the State [is] vested," is responsible under the State Constitution "for the faithful execution of the laws." Hawaii State Constitution (Haw. Const.) art. V, §§ 1 and 5. He is responsible too for the submission "to the legislature [prior to the opening of each regular session in an odd–numbered year of] a budget in a form provided by law setting forth a complete plan of proposed expenditures of the executive branch[.]" Haw. Const. art VII, § 8. "[U]pon the opening of each such session, [he] submit[s] bills to provide for such proposed expenditures[,]" *id.*, and the legislature enacts "an appropriation bill or bills providing for the anticipated total expenditures of the State for the ensuing fiscal biennium." *Id.* § 9. Since general fund expenditures exceeding the State's current general fund revenues and unencumbered cash balances are interdicted by the State Constitution, it also mandates that "[p]rovision for the control of the rate of expenditures of appropriated

---

[1] The defendants challenge HSTA's standing to sue. Though we have doubts that the association has standing, we do not find it necessary to discuss this question.

state moneys, and for the reduction of such expenditures under prescribed conditions, shall be made by law." Haw. Const. art. VII, § 5.

The Governor exercises control over the executive budget through the Department of Budget and Finance, which is headed by the Director of Finance. Pursuant to Hawaii Revised Statutes (HRS) § 26–8, the department is charged with "the preparation and execution of the executive budget of the state government;" it is also directed thereunder to "conduct a systematic and continuous review of the finances, organization, and methods of each department of the State to assist each department in achieving the most effective expenditure of . . . public funds and to determine that such expenditures are in accordance with the budget laws and controls in force[.]"

The department within the executive branch charged with oversight of the statewide system of public schools is the Department of Education, which is headed by an executive board known as the Board of Education. HRS § 26–12. The Board is vested under the State Constitution with "power, as provided by law, to formulate policy and to exercise control over the public school system[;]" it has "jurisdiction over the internal organization and management of the . . . system, as provided by law[.]"[2]

## B.

The plaintiffs instituted their suit for declaratory and injunctive relief against George R. Ariyoshi, then Governor of the State, and Jensen S. L. Hee, then Director of Finance, on November 6, 1985, seeking "to determine the powers of the BOARD to formulate policy and exercise control over the public school system and the internal organization and management of that system[.]" They subsequently substituted Governor John Waihee and the incumbent Director of Finance, Yukio Takemoto, as defendants and amended their complaint, claiming therein that the ability of

---

[2] Haw. Const. art. X, § 3 reads:

The board of education shall have the power, as provided by law, to formulate policy and to exercise control over the public school system through its executive officer, the superintendent of education, who shall be appointed by the board; except that the board shall have jurisdiction over the internal organization and management of the public school system, as provided by law, and shall exercise its jurisdiction in a manner consistent with general laws.

the Board and the Department of Education (DOE) "to plan and efficiently execute many . . . programs, to set priorities for those programs, hire the necessary personnel, and perform certain necessary repairs and maintenance of school facilities" had been destroyed or limited by the defendants' actions. They also alleged the Board's powers under the State Constitution had been usurped by the defendants in other ways.

The lengthy twenty–seven page complaint recounted in detail the numerous actions of the defendants constituting, in the plaintiffs' view, undue interference with or usurpation of the Board's powers. In sum, the plaintiffs specifically averred: (1) the defendants interfered with "the power of the Board to formulate policy and exercise control over the public school system in presenting the DOE budget to the legislature[;]" (2) the Governor interfered with "the Board's implementation of the budget passed by the legislature by failing to use the constitutional power of veto but instead imposing arbitrary and capricious spending restrictions[;]" (3) the defendants and other state departments interfered with "the Board's administration of its budget, programs, and assets after the budget [was] approved by both the legislature and the governor[;]" (4) the defendants interfered with "an internal reorganization plan prepared by the DOE and approved by the Board [in] violation of the constitutional provisions . . . specifically grant[ing] the Board jurisdiction over the internal organization and management of the public school system[;]" (5) the Governor refused to "assign the functions of school maintenance and repair, the operation of the school bus system, and the maintenance and operation of teacher housing to the Board, where [these] functions properly belong as part of the internal organization and management of the public school system[;]" and (6) the Governor "imposed and continues to impose improper delays and restrictions on the Board's power to adopt rules" pursuant to the Administrative Procedure Act.

After "[a] substantial amount of discovery was had on both the original and amended [c]omplaint[s]," the defendants moved for dismissal of the complaint or for summary judgment.[3] They sought dismissal on grounds that the case involved nonjusticiable questions, the plaintiffs lacked standing to bring the action, and the case was moot; they sought summary judgment on grounds that the State Constitution did "not ex-

---

[3] The plaintiffs also sought a partial summary judgment.

empt the [Board] and the [DOE] from the budget preparation and budget execution policies of the State, even if such policies affect the internal organization or management of the public school system[]" and the relevant actions of "the Governor and the Director of Finance [were] within their respective constitutional and statutory authority." The circuit court held the case "involve[d] political questions . . . inappropriate for [judicial] resolution" and dismissed the suit, citing our decision in *Trustees of OHA v. Yamasaki* and *Trustees of OHA v. Hong*, 69 Haw. ____, 737 P.2d 446, *cert. denied*, ___ U.S. ___, 108 S. Ct. 234 (1987), in support of its ruling. The plaintiffs then perfected a timely appeal from the order dismissing their suit.

## II.

We begin our consideration of the appeal by revisiting *Trustees of OHA v. Yamasaki* and *Trustees of OHA v. Hong* where "[o]ur inquiry into the facts and postures of the two cases reveal[ed] the issues 'to be of a peculiarly political nature and therefore not meet for judicial determination[.]' *Colegrove v. Green*, 328 U.S. 549, 552 (1946)[.]" 69 Haw. at ____, 737 P.2d at 458.

## A.

The Trustees of the Office of Hawaiian Affairs (OHA) brought two suits against several officers of the State and a public corporation, seeking rulings that OHA was "entitled to receive twenty per cent of the income derived from certain lands held in trust by the State by virtue of state legislation implementing provisions of the act of Congress admitting Hawaii into the Union[.]" *Id.* at ____, 737 P.2d at 448. They sued the Attorney General, the Chairman of the Board of Land and Natural Resources, and the Director of Finance in the first, "seeking twenty per cent of what the State received as damages for the illegal mining of sand from Papohaku Beach on Molokai." *Id.* at ____, 737 P.2d at 458. They sued the foregoing officers, the Director of Transportation, and the Aloha Tower Development Corporation in the second, praying for a declaration that OHA was "entitled to its pro rata share of the income and proceeds from sales, leases, or other dispositions of lands surrounding harbors on all the major islands, of land on Sand Island, of land on which the State's major airport

is located, and of land on which the Aloha Tower complex stands." *Id.* at
___, 737 P.2d at 458. We reversed the circuit court's denial of the defendants' summary judgment motions because we were convinced the Trustees' claims were "of a peculiarly political nature . . . not meet for judicial determination[.]" *Id.* at ___, 737 P.2d at 458.

We reached this conclusion only after a survey of justiciability in its several aspects and a discriminating inquiry into the facts and posture of each case, for a ruling that a case involves a political question "renders the government conduct [in question] immune from judicial review. Unlike other restrictions on judicial review—doctrines such as case or controversy requirements, standing, ripeness and prematurity—all of which may be cured by different factual circumstances, a holding of nonjusticiability [from an application of the political question doctrine] is absolute in its foreclosure of judicial scrutiny." Nowak, Rotunda & Young, *Constitutional Law* 102 (3d ed. 1986) (footnote omitted). Examining justiciability as expounded by the Supreme Court, we learned

> that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217 (1962). We also learned the doctrine "is one of 'political questions,' not one of 'political cases[,]'" and "courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority." *Id.*

Our inquiry into the facts revealed the Trustees of OHA were asking the circuit court to rule that the defendants were "misreading and misap-

plying HRS § 10–13.5 and to order that some funds controlled by [the defendants] be turned over to OHA." *Trustees of OHA v. Yamasaki*, 69 Haw. at ____, 737 P.2d at 457. The judicial "task at first sight appear[ed] to be one of statutory interpretation. But a closer look at the disputes reveal[ed] they [were not] traditional fare for the judiciary; and if the circuit court ruled on them, it would [have intruded] in an area committed to the legislature." *Id.* at ____, 737 P.2d at 457.

The task ostensibly called for an interpretation of HRS § 10–13.5, which provides that "[t]wenty per cent of all funds derived from the public land trust described in [HRS §] 10–3[] shall be expended by [OHA]." As noted earlier, the Trustees sought twenty per cent of what the State received as damages for the illegal mining of sand from Papohaku Beach in the first case. Though the beach is part of Hawaii's public domain, "nothing in HRS § 10–3 . . . serve[d] as a statutory base for a ruling that such damages are funds derived from the public land trust or that a pro rata portion of the land conveyed to the State in lieu of the damages should in turn be conveyed to the Trustees of OHA." *Id.* at ____, 737 P.2d at 458. "Either ruling," we concluded, "would [have been] rendered possible only by an initial policy determination . . . of a kind normally reserved for nonjudicial discretion." *Id.* at ____, 737 P.2d at 458. For "there were [many] uncertainties with respect to the ceded lands comprising the trust res and the funds derived therefrom." *Id.* at ____, 737 P.2d at 457. There were uncertainties about "what and where ceded lands exist, the legal and fiscal problems which may exist or arise from their use, and the effect on all parties concerned with the use and distribution of revenues generated from ceded lands." Stand. Comm. Rep. No. 396, in 1982 House Journal, at 1061; Stand. Comm. Rep. No. 663, in 1982 House Journal, at 1200; Stand. Comm. Rep. No. 565, in 1982 Senate Journal, at 1190; Stand. Comm. Rep. No. 768, in 1982 Senate Journal; at 1279. And in the opinion of the Legislative Auditor, these uncertainties were incapable of resolution "without further legislative action." *Trustees of OHA v. Yamasaki*, 69 Haw. at ____, 737 P.2d at 458.

A ruling as prayed for in the second case, that is, OHA was entitled to a pro rata share of the revenues generated through the use or disposition of harbor and airport lands, "would [have been] at odds with legislative commitments relative to such revenues." *Id.* at ____, 737 P.2d at 458. We also could find "no 'judicially discoverable and manageable standards' that could be employed to resolve the conflict between the mandates of

HRS [§] 10–13.5 and" the legislative mandates regarding income derived from the use of the foregoing lands in § 261–5. *Id.* at ____, 737 P.2d at 458 (citation omitted). Thus, we agreed with the Legislative Auditor that the uncertainties surrounding the trust res and the funds derived therefrom could not be resolved without further legislative action and concluded the circuit court would have trod on legislative turf if it ruled on the questions posed in both cases.

### B.

Like the pleadings in the OHA cases, the pleadings in the case now before us describe intra–executive branch disputes. The defendants would have us rule "[t]he resolution of interdepartmental problems is normally done within the executive branch[]" and the Board as well as its members therefore lack standing to sue. "The mere assertion of a claim of an 'intra–branch dispute,' without more," however, does not render the dispute nonjusticiable. *United States v. Nixon*, 418 U.S. 683, 693 (1974); *see also State ex rel. Amemiya v. Anderson*, 56 Haw. 566, 545 P.2d 1175 (1976) (Attorney General brought declaratory action against Director of Finance). As we emphasized in the OHA cases, "[t]he nonjusticiability of a political question is primarily a function of the separation of powers." *Baker v. Carr*, 369 U.S. at 210. Our rulings there were bottomed on "a lack of judicially discoverable and manageable standards for resolving [the issues raised therein and] the impossibility of deciding [them] without an initial policy determination of a kind clearly for nonjudicial discretion[.]" *Id.* at 217. But we cannot say the record in the case at hand manifests a commitment to a coordinate political branch of the questions for which judicial determinations were sought.

Alleging the Governor and the Director had interfered with and usurped the powers vested in the Board by article X, section 3 of the State Constitution, the plaintiffs sought a declaration of "the powers of the BOARD to formulate policy and exercise control over the public school system and the internal organization and management of that system[.]" Obviously a judicial declaration of the Board's powers under the constitution would have political repercussions—"all constitutional interpretations have political consequences." R. Jackson, *The Supreme Court in the American System* 56 (1955). Still, a court "cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'po-

litical' exceeds constitutional authority[,]" *Baker v. Carr*, 369 U.S. at 217, unless the matter at hand has been committed to another branch of government and a decision would compel the court "to make judgments not susceptible to the usual tools of judicial methodology[.]" K. Ripple, *Constitutional Litigation* 96 (1984). Inasmuch as the matter at hand was textual interpretation, which undoubtedly constitutes judicial fare, the circuit court erred in dismissing the plaintiffs' suit on the ground that it involved political questions.

### III.

Having decided that the circuit court erroneously rejected a controversy subject to judicial resolution, we proceed to the question of whether the plaintiffs' suit was subject to summary disposition in favor of either the plaintiffs or the defendants.

### A.

Since the allegations of the plaintiffs, in short, were that the defendants misread and misapplied a constitutional provision and must be directed to follow it, we begin with a brief look at its provenance. The constitution drafted in 1950 and adopted by the citizens of the State of Hawaii in 1959 established a Board of Education and vested it with power "to formulate policy, and to exercise control over the public school system through its executive officer, the superintendent of public instruction[.]" Haw. Const. art. IX, § 3. That the Board was given less than a free hand in formulating policy and exercising control over the system is evident, for these powers were to be employed "in accordance with law[.]" *Id.*

The review of the State of Hawaii's fundamental document conducted in 1978 resulted in the renumbering and amendment of the provision. What was article IX, section 3 is now article X, section 3, and it reads:

> The board of education shall have the power, *as provided by law*, to formulate policy and to exercise control over the public school system through its executive officer, the superintendent of education, who shall be appointed by the board; *except*

*that the board shall have jurisdiction over the internal organi-*
*zation and management of the public school system, as pro-*
*vided by law, and shall exercise its jurisdiction in a manner*
*consistent with general laws.*

(Emphasis supplied to indicate new language). The amendment was meant "to give the [Board] jurisdiction over the internal organization and management of the public school system to the fullest extent possible." Comm. Whole Rep. No. 6, in *Proceedings of the Constitutional Convention of Hawaii of 1978* [*1978 Proceedings*], at 1006. But "those matters [that would] be within the jurisdiction of the board" were to be defined by the legislature. *Id.*

The constitutional assembly recognized too "that the department of education is an executive department subject to the governor's statewide policy–making and executive powers." *Id.* at 1006– 07. And the report issued by the delegates to the convention sitting as a committee of the whole underscored their intent to subordinate the Board's powers in budget–making to the Governor's; for the report states the amendment

would not affect the governor's authority over the board of education with respect to policy formulation affecting the public in budget preparation. In the budget–making process, the governor would continue to review the board's requests before its submission to the legislature. Nor would the budget–making powers or process of the legislature be altered.

*Id.* at 1007. Article X, section 3, therefore, can hardly be characterized as a constitutional declaration emancipating the Board of Education from all executive direction, and what has been "provided by law"[4] is consistent with the intention of the framers not to divest the Governor of his "state-wide policy–making and executive powers" or his authority over the executive budget.

---

[4]"The phrase 'as provided by law' in the context of . . . state constitutional provisions [is a directive] to the legislature to enact implementing legislation." *State v. Rodrigues*, 63 Haw. 412, 415, 629 P.2d 1111, 1114 (1981). And the subject matter modified by the phrase "'may be dealt with by the Legislature as it deems appropriate.'" *State ex rel. Agnew v. Schneider*, 253 N.W.2d 184, 187 (N.D. 1977) (quoted in *State v. Rodrigues, supra*).

## B.

To begin, the structure of government ordained by the legislature makes the DOE one of the eighteen principal departments "[u]nder the supervision of the governor" to which the "executive and administrative offices, departments, instrumentalities of the state government and their respective functions, powers, and duties [have been] allocated[.]" HRS § 26–4. "Under policies established by the [B]oard, the superintendent [of education] administer[s] programs of education and public instruction throughout the State[.]" HRS § 26– 12. These include programs "at the preschool, primary and secondary school levels, adult education, school library services, health education and instruction (not including dental health treatment transferred to department of health), and such other pro- . grams as may be established by law." *Id.* The Board also establishes policies "for the administration of programs relating to public library services and transcribing services for the blind." *Id.*

The Board's authority to "administer programs of education and public instruction," however, does not include the actual preparation and execution of the DOE's budget; for as we noted at the outset, the Department of Budget and Finance is responsible for "the preparation and execution of the executive budget of the state government." HRS § 26–8. And since it is

the policy and intent of the legislature that the total appropriations made by it, or the total of any budget approved by it, for any department [is] the maximum amount authorized to meet the requirements of the department . . . for the period of the appropriation, . . . the governor and the director of finance [have been] given the powers [to effect savings] by careful supervision throughout each appropriation period with due regard to changing conditions; and by promoting more economic and efficient management . . . .

HRS § 37–31.

These powers are described in sections 37–32 to 37–42 of the Hawaii Revised Statutes, which establish an allotment system whereby appropriated moneys are made available for expenditure on a quarterly basis upon prior estimates of requirements submitted by the departments to the Director of Finance. His approval of these estimates, however, is no assurance that the allotted sums will be available for expenditure, for the direc-

tor is empowered under HRS §§ 37–36 and 37–37 to modify or reduce the allotted sums under given conditions.[5]

## IV.

When we consider whether summary judgment in favor of the plaintiffs or the defendants was appropriate in the light of the foregoing constitutional and statutory provisions and the relevant circumstances as re-

---

[5] HRS § 37–36 (Supp. 1988) reads:

**Modification.** The director of finance may at any time modify or amend any previous allotment upon application of, or upon notice to, the department or establishment concerned; provided that for the University of Hawaii or the department of education, the director of finance may modify or amend any previous allotment only upon application of the university or the department of education, or upon notice to the university or the department of education, and the approval of the governor that the modification is necessary to avoid an illegal result; provided further that no deficit or undue reduction of funds to meet future needs of the department or establishment will result therefrom; and provided further that no modification or amendment reduces an allotment below the amount required to meet valid obligations or commitments previously incurred against the allotted funds.
HRS § 37–37(b) (Supp. 1988) reads:

(b) For the University of Hawaii or the department of education, when the director of finance determines at any time that the probable receipts from taxes or any other sources for any appropriation will be less than was anticipated, and that consequently the amount available for the remainder of the term of the appropriation or for any allotment period will be less than the amount estimated or allotted therefor, the director shall advise the governor of the situation, and the governor shall redetermine the allotment ceiling for the affected source or sources of funding pursuant to section 37–34, and shall advise the university or the department of education, as applicable, of the redetermination. The university or the department of education, within twenty days of the governor's notification, shall submit revised estimates consistent with the governor's redetermination to the director of finance; otherwise, the director of finance shall modify, amend, or reduce any allotment of the university or the department of education, as applicable, to comply with the governor's redetermination; provided that no reduction reduces any allotted amount below the amount required to meet valid obligations or commitments previously incurred against the allotted funds.

counted in the affidavits supporting the plaintiffs' motion, we can only conclude the defendants should have been awarded summary judgment.

To begin with, a perusal of the record reveals that much of what the plaintiffs originally alleged as executive conduct in violation of article X, section 3 of the State Constitution has been rendered moot by the passage of time, a change of administrations, and statutory amendments. In the memorandum supporting their motion for partial summary judgment and opposing the defendants' motion to dismiss the complaint or for summary judgment, the plaintiffs acknowledged that the relief they were then seeking was not what they sought at the outset of the proceedings. The "Plaintiffs," they further allowed, "are *not* questioning the right of the Governor to restrict amounts appropriated by the Legislature, providing such restrictions are necessary because of changes in the fiscal condition of the State; and they are *not* trying to remove the Governor's 'influence' with regard to departmental reorganization or the adoption of administrative rules."

## A.

What the plaintiffs were seeking in Count "A" of their amended complaint, in the words of the memorandum, was that the Governor be ordered to "inform the BOE of the amount of money available to it in both the biennial and supplemental budgets and then allow that Board to allocate such money among the various educational programs, facilities and activities." They "specifically object[ed] to the current practice of allowing uninformed budget analysts in the Department of Budget and Finance ('B & F') to make detailed decisions in the allocation of the education budget, and thus, for all practical purposes, formulate policy and exercise control over the public school system."

The gravamen of this count is that the Governor and the Director of Finance unilaterally altered the Board's budgetary proposals before submitting them to the legislature as part of the executive budget and thereby infringed the Board's powers to formulate policy and determine its own program priorities. The framers of article X, section 3 of the Hawaii Constitution, however, contemplated that the provision "would not affect the governor's authority over the board of education with respect to policy formulation affecting the public in budget preparation[]" and that in "the budget making process, the governor would continue to review the

board's requests before . . . submission to the legislature." *1978 Proceedings*, at 1007. The power of review would be an empty one indeed if it did not encompass the power to alter or amend. We have no reason to believe the Governor's authority in this regard does not include discretion to restructure the Board's program priorities when the law provides that "[t]he governor shall direct the preparation and administration of state programs, program and financial plans, and budget[]" with assistance from the director of finance. HRS §§ 37–65 and 37–67.

### B.

The relief sought under Count "B" was an order to the effect "that if the State financial condition [compelled a reduction of expenditures], the Governor [should] place a proportionate percentage restriction on legislative appropriations, and then allow the BOE to allocate such restriction among the educational programs and activities[.]" The plaintiffs "specifically object[ed] to the broad financial restrictions imposed without financial justification, when the Governor should use the item veto pursuant to the constitution."

In essence, the plaintiffs alleged the Governor interfered with the Board's implementation of the budget approved by the legislature when he imposed a one per cent spending restriction on the DOE. The Governor, the plaintiffs maintain, may impose such restrictions only if sufficient funds are not available. But "the policy and intent of the legislature [is] that the total appropriations made by it . . . for any department [is] the maximum amount authorized to meet the requirements of the department . . . for the period of the appropriation," and "the governor and the director of finance [have been] given the powers [to effect savings] by careful supervision throughout each appropriation period[.]" HRS § 37–31. Moreover, when advised by the director of finance "that the probable receipts from taxes or any other sources for any appropriation will be less than was anticipated, and that consequently the amount available for the remainder of the term of the appropriation or for any allotment period will be less than the amount estimated or allotted therefor," the Governor is obliged "to redetermine the allotment ceiling[.]" HRS § 37–37(b). Since the plaintiffs did not aver that such was not the case here, we perceive no basis for declaring that the Governor's action breached any constitutional or

statutory provision or that an exercise of the veto power was the only means by which a spending restriction was imposable.

## C.

With regard to Count "C" of the amended complaint the plaintiffs prayed "that the [DOE] be given the right to acquire budgeted goods and services necessary for the efficient operation of the education system without having to route such decisions through other departments[.]" In the memorandum supporting their motion for summary judgment, however, they conceded that "a substantial part of the relief requested in the original Count 'C' [has been granted by the legislature] and some part has been granted by order of the current administration, but the jurisdictional boundaries should be more clearly defined." [6] Again we perceive no basis for a judicial declaration as prayed for by the plaintiffs.

## D.

The relief sought for Count "D" was an order "that the constitutional grant to the BOE of '. . . jurisdiction over the internal organization and management of the public school system . . .' (Haw. Const. art. X, § 3) be respected by the Governor and the B & F[.]" The objection here was "to the detailed and trivial interference with departmental reorganization exercised by the B & F which causes delay and serves no valid purpose." But the plaintiffs acknowledge "[t]he reorganization plan was finally approved by the Governor and the Director of Budget and Finance on July 18, 1985." Thus, the dispute was no longer viable when the circuit court heard the motions for summary judgment.

## E.

The plaintiffs' prayer for Count "E" was that "the Governor [be ordered], pursuant to . . . 1965 Hawaii Sess. Laws 97, [to] consolidate various functions such as repair and maintenance of school buildings, student transportation, and teacher housing in the DOE, instead of putting 'policy

---

[6] The plaintiffs did not seek summary judgment on this count.

making' in one department and funding and personnel in another." The claim regarding school repair and maintenance was that "the effective operation of that service require[d the] management of the service on Oahu be lodged with the DOE [rather than the Department of Accounting and General Services (DAGS)], and decentralized to the district and school level." With regard to student transportation, the plaintiffs objected to the fact that "[w]hile policies and procedures, including fares to be paid, are set by the BOE, the funds for such transportation are appropriated to DAGS and all bus contracts are arranged by that department."

In effect, the plaintiffs sought a judicial declaration that the DOE should be allowed to expend funds appropriated for the foregoing purposes. But this would be at odds with the designation of DAGS as the expending agency for the appropriated funds in Session Laws of Hawaii (Haw. Sess. Laws) 1987, ch. 216, § 3.

### F.

Finally, the plaintiffs sought an order "that the BOE's rule making power, under Chapter 91, HAWAII REV. STAT., not be restricted or improperly interfered with by the Governor or other officials, through the requirement that 'preliminary' approval be had before a public hearing is noticed and held." Section 91–3(c) of the Administrative Procedure Act, however, provides that "[t]he adoption, amendment, or repeal of any rule by any state agency shall be subject to the approval of the governor." Thus, there is no basis for a court to rule he exceeded his powers in adopting a preliminary approval procedure.

For the foregoing reasons, the defendants were entitled to summary judgment on all counts. The circuit court's order of dismissal is vacated, and the case is remanded for entry of an appropriate judgment.

*Thomas P. Gill* (*Vernon Yu* with him on the briefs; Gill, Park, Park & Kim, of counsel) for appellants.

*Charleen M. Aina* (*Diane Erickson* with her on the brief), Deputy Attorneys General, for appellees.