31 P.3d 901

**OFFICE OF HAWAIIAN AFFAIRS and the Board of Trustees of the Office of Hawaiian Affairs, Plaintiffs–Appellees,**

v.

**STATE of Hawai'i, Defendant–Appellant,**

and

**John Does 1–10, Jane Does 1–10, Doe Partnerships 1–10, Doe Corporations 1–10, Roe "Non–Profit" Corporations 1–10, and Roe Governmental Entities 1–10, Defendants.**

Nos. 20281, 20216.

Supreme Court of Hawai'i.

Sept. 12, 2001.

Andrew L. Frey, pro hac vice, (of Mayer, Brown & Platt (New York)) (Charleen M. Aina and Dorothy Sellers, Deputy Attorneys General, with him on the briefs), for defendant-appellant State of Hawai'i.

James E. Duffy, Jr., (Archie T. Ikehara, and Leslie E. Kobayashi, of Fujiyama, Duffy & Fujiyama, with him on the briefs), Honolulu, for plaintiffs-appellees Office of Hawaiian Affairs and Board of Trustees of the Office of Hawaiian Affairs.

Carl C. Christensen, (Native Hawaiian Legal Corporation), Honolulu, on the briefs, for amicus curiae Reginal D. Manaku.

Jeffrey N. Watanabe, John T. Komeiji, Edward B. Rogin, Lyle Y. Harada, and Beth K. Fujimoto, (of Watanabe, Ing & Kawashima), Honolulu, on the briefs, for amicus curiae Airlines Committee of Hawai'i, Inc.

H. William Burgess, on the briefs, for amicus curiae Jack H. Schaff, Donna Malia Schaff, Sandra P. Burgess, and H. William Burgess.

MOON, C.J., KLEIN,[1] LEVINSON, NAKAYAMA, and RAMIL, JJ.

Opinion of the Court by MOON, C.J.

In this case involving a dispute over revenues owed to plaintiffs-appellees the Office of Hawaiian Affairs (OHA), under HRS § 10–13.5 (1993), the State of Hawai'i (the State) brings this interlocutory appeal from the first circuit court's October 24, 1996 orders:[2] (1) denying the State's motion to dismiss for lack of subject matter jurisdiction; and (2) granting OHA's motions for partial summary judgment.

The issues in this case center around the application of HRS § 10–13.5 and the definition of "revenue" under HRS § 10–2, both as amended by Act 304. *See* 1990 Haw. Sess. L. Act 304, §§ 3 & 7 at 948 & 951. Subsequent to the circuit court's ruling, federal legislation was enacted by Congress, which the State contends affects the validity of Act 304. For the reasons that follow, we hold that Act 304, as applied to revenue derived from the Honolulu International Airport, conflicts with the federal legislation. Therefore, Act 304—by its own terms—is effectively repealed. *See* 1990 Haw. Sess. L. Act 304, § 16 at 953 (invalidating the entire act if any

provisions conflict with federal law, rules, or regulations). Consequently, in the absence of the substantive statutory amendments prescribed in Act 304, this court is left with no judicially manageable standards by which to determine whether OHA is entitled to the specific revenues sought in this suit. Accordingly, we reverse the circuit court's orders and dismiss this case for lack of justiciability.

## I. *BACKGROUND*

### A. *History of Dispute*

This suit arises out of the longstanding dispute between OHA and the State[3] over the disposition of revenues generated from certain lands held in trust by the State for the benefit of, *inter alia,* native Hawaiians.[4]

Before being overthrown, Hawai'i was recognized as an independent monarchy. *See* S.J. Res. 19, 103rd Cong., 1st Sess. (1993) (apologizing to Native Hawaiians on behalf of the people of the United States for the overthrow of the Kingdom of Hawai'i). In 1898, approximately five years following the overthrow, Hawai'i, which had become the Republic of Hawai'i, was annexed to the United States. *See* J. Res. 55, 30 Stat. 750 (1898) (Joint Resolution to Provide for Annexing the Hawaiian Islands to the United States). In addition to its sovereignty, the Republic "ceded and transferred to the United States the absolute fee and ownership of all public, Government, or Crown lands belonging to the Government of the Hawaiian Islands together with every right and appurtenance thereunto appertaining." *Yamasaki,* 69 Haw. at 159, 737 P.2d at 449. Following annexation and until 1959, Hawaii's seat of power was vested in a Territorial Govern-

---

1. Associate Justice Klein, who heard oral argument in this case, resigned from the court on February 4, 2000. *See* Hawai'i Revised Statutes (HRS) § 602–10 (1993).

2. The orders were entered by then-circuit judge Daniel G. Heely, who resigned from the judiciary on October 25, 1996.

3. For a more detailed factual account of the historical circumstances leading up to this dispute, *see Trustees of OHA v. Yamasaki,* 69 Haw. 154, 737 P.2d 446, *cert. denied,* 484 U.S. 898, 108 S.Ct. 234, 98 L.Ed.2d 192 (1987).

4. HRS § 10–2 (1993) defines "Native Hawaiian" as

> any descendant of not less than one-half part of the races inhabiting the Hawaiian Islands previous to 1778, as defined by the Hawaiian Homes Commission Act, 1920, as amended; provided that the term identically refers to the descendants of such blood quantum of such aboriginal peoples which exercised sovereignty and subsisted in the Hawaiian Islands in 1778 and which peoples thereafter continued to reside in Hawaii.

ment. *See* Organic Act § 3, Act of April 30, 1900, c. 339, 31 Stat. 141, *reprinted in* 1 HRS 43, 44 (1993) (establishing the government of the Territory of Hawai'i).

In 1959, Hawai'i became a state. As a condition of its admission into the Union, the State of Hawai'i agreed to hold certain lands granted to the State by the United States in a public land trust for five purposes [hereinafter, the ceded lands or the public land trust]. *See* Admission Act of March 18, 1959, Pub.L. No. 86-3, § 5, 73 Stat. 4, *reprinted in*, 1 HRS 90, 91–92 (1993).

Section 5(b) of the Admission Act defined the trust lands as follows:

Except as provided in subsection (c) and (d) of this section, the United States grants to the State of Hawaii, effective upon its admission into the Union, the United States' title to all the public lands and other property, and to lands defined as "available lands" by section 203 of the Hawaiian Homes Commission Act, 1920, as amended, within the boundaries of the State of Hawaii, title to which is held by the United States immediately prior to its admission into the Union. The grant hereby made shall be in lieu of any and all grants provided for new States by provisions of law other than this Act, and such grants shall not extend to the State of Hawaii.

*Id.*

Section 5(f) of the Admission Act delineated the purposes for which the ceded lands were to be used:

The lands granted to the State of Hawaii by subsection (b) of this section and public lands retained by the United States under subsections (c) and (d) and later conveyed to the State under subsection (e), together with the proceeds from the sale or disposition of any such lands and the income therefrom, shall be held by said State as a public trust [1] for the support of the public schools and [2] other public educational institutions, [3] *for the betterment of the conditions of native Hawaiians,* as defined in the Hawaiian Homes Commission Act, 1920, as amended, [4] for the development of farm and home ownership on as widespread a basis as possible for the making of public improvements, and

[5] for the provision of lands for public use. Such lands, proceeds, and income shall be managed and disposed of for one or more of the foregoing purposes in such manner as the constitution and laws of said State may provide, and their use for any other object shall constitute a breach of trust for which suit may be brought by the United States[.]

*Id.* (emphasis added).

In the absence of more specific guiding mandates, "public education became the primary beneficiary of the trust." *Yamasaki,* 69 Haw. at 161–62, 737 P.2d at 451. However, in 1978, the State held a Constitutional Convention, at which time the State's trust obligation to native Hawaiians was clarified in article XII, entitled "Hawaiian Affairs." Article XII, section 4 of the Hawai'i constitution provides:

### Public Trust

**Section 4.** The lands granted to the State of Hawaii by Section 5(b) of the Admission Act and pursuant to Article XVI, Section 7, of the State Constitution, excluding therefrom lands defined as "available lands" by Section 203 of the Hawaiian Homes Commission Act, 1920, as amended, shall be held by the State as a public trust for native Hawaiians and the general public.

Haw. Const. art. XII, § 4.

Article XVI, section 7, provides:

### Compliance With Trust

**Section 7.** Any trust provisions which the Congress shall impose, upon the admission of this State, in respect of the lands patented to the State by the United States or the proceeds and income therefrom, shall be complied with by appropriate legislation. Such legislation shall not diminish or limit the benefits of native Hawaiians under Section 4 of Article XII.

Haw. Const. art. XVI, § 7.

Article XII, section 5 created OHA and charged it with managing the funds designated for the benefit of native Hawaiians:

### Office of Hawaiian Affairs; Establishment of Board of Trustees

**Section 5.** There is hereby established an Office of Hawaiian Affairs. The Office of Hawaiian Affairs shall hold title to all the real and personal property now or hereafter set aside or conveyed to it which shall be held in trust for native Hawaiians and Hawaiians. There shall be a board of trustees for the Office of Hawaiian Affairs elected by qualified voters who are Hawaiians, as provided by law.

Haw. Const. art. XII, § 5.[5]

A board of trustees of OHA was also established:

### Powers of Board of Trustees

**Section 6.** The board of trustees of the Office of Hawaiian Affairs shall exercise power as provided by law: to manage and administer the proceeds from the sale or other disposition of the lands, natural resources, minerals and income derived from whatever sources for native Hawaiians and Hawaiians, including all income and proceeds from that pro rata portion of the trust referred to in section 4 of this article for native Hawaiians; to formulate policy relating to affairs of native Hawaiians and Hawaiians; and to exercise control over real and personal property set aside by state, federal or private sources and transferred to the board for native Hawaiians and Hawaiians. The board shall have the power to exercise control over the Office of Hawaiian Affairs through its executive officer, the administrator of the Office of Hawaiian Affairs, who shall be appointed by the board.

Haw. Const. art. XII, § 6.

Pursuant to the mandates of the Hawai'i Constitution, legislation was enacted in 1979 that set forth the purposes of OHA and described the powers and duties of the Board of Trustees. *See* 1979 Haw. Sess. L. Act 196, at 406 (codified at HRS chapter 10). However, the 1979 legislative action "did not repre-

sent the final word on the matter[.]" *Yamasaki,* 69 Haw. at 165, 737 P.2d at 453. It was understood that there was much work left to be completed by subsequent legislatures in order to determine the "appropriate boundaries of the public trust." *Id.* (citing Stand. Comm. Rep. No. 784, in 1979 Senate Journal at 1353).

In 1980, the legislature amended chapter 10 by adding HRS § 10–13.5, which provided that "[t]wenty per cent of all funds derived from the public land trust ... shall be expended by [OHA] for the purposes of this chapter." 1980 Haw. Sess. L. Act 273, at 525. However, "this too was not the final legislative word on OHA's pro rata share of funds from the trust." *Yamasaki,* 69 Haw. at 165, 737 P.2d at 453.

Between 1980 and 1983, OHA became increasingly dissatisfied with the State's lack of progress in fulfilling its obligations. In 1983, because OHA "felt the State was not allocating twenty per cent of all funds derived from the public land trust to OHA[,]" OHA sued the State and various officers thereof, seeking declaratory and injunctive relief. *Id.* The defendants moved to dismiss, but the circuit court denied the motions. On interlocutory appeal, this court reversed the circuit court's ruling and remanded for entry of an order dismissing the case as involving a nonjusticiable political question. Essentially, this court held that it was unable to determine the parameters of HRS § 10–13.5 "because the seemingly clear language of HRS § 10–13.5 actually provide[d] no 'judicially discoverable and manageable standards' for resolving the dispute[d] [issues in the case]." *Yamasaki,* 69 Haw. at 173, 737 P.2d at 457 (citation omitted).

In response, the legislature enacted Act 304. 1990 Haw. Sess. L. Act 304, at 947. Section 7 of Act 304 amended HRS § 10–13.5 to provide: "Twenty per cent of all *revenue* derived from the public land trust shall be expended by [OHA] for the betterment of the conditions of native Hawaiians." 1990 Haw.

---

**5.** We note that the decision by the United States Supreme Court in *Rice v. Cayetano,* 528 U.S. 495, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000), holds the voting restriction in article XII, section 5 unconstitutional because its limitation of those qualified to vote in OHA elections to Hawaiians or native Hawaiians violates the fifteenth amendment to the United States Constitution. The *Rice* decision, however, has no effect on the outcome of this appeal.

Sess. L. Act 304, § 7 at 951; HRS § 10–13.5 (1993) (as amended) (emphasis added). The legislature then defined "revenue" in section 3 of Act 304 to include all

> proceeds, fees, charges, rents, or other income ... derived from any ... activity[ ] that is situated upon and results from the actual use of ... the public land trust ..., but excluding any income, proceeds, fees, charges, or other moneys derived through the exercise of sovereign functions and powers including [12 enumerated descriptions of sources of revenue that are excluded from the term "revenue" under the statute].

1990 Haw. Sess. L. at 304, § 3 at 948; HRS § 10–2.

Section 8 of Act 304 provided a mechanism whereby the State, through the Department of Budget and Finance (B & F), and OHA were to determine the amounts owed to OHA for the period June 16, 1980 through June 30, 1991. 1990 Haw. Sess. L. Act 304, § 8, at 951. On April 16, 1993, the legislature appropriated funds for payment of approximately 130 million dollars to OHA pursuant to Act 304. 1993 Haw. Sess. L. Act 35, at 41. In a memorandum dated April 28, 1993, OHA and the State memorialized the results of their negotiations and noted that "[the Office of State Planning ([]OSP[)] and OHA recognize and agree that the amount specified in section 1 hereof does not include several matters regarding revenue which OHA has asserted is due OHA and which OSP has not accepted and agreed to." With respect to the matters agreed upon and in satisfaction thereof, the State, on June 4, 1993, tendered two warrants to OHA totaling $129,584,488.85.

## B. *Case History*

On January 14, 1994, OHA instituted the present action, alleging that the State had failed to pay OHA its pro rata share of unspecified revenues that the State had collected since June 16, 1980 from the ceded lands. OHA sought an accounting, restitution or damages, pre-judgment interest, reasonable attorneys' fees and costs, and such other relief as the court deemed just and proper.

On May 2, 1996, OHA specified that it was seeking its pro rata share of revenues received by the State based on: (1) Waikiki Duty Free receipts (in connection with the lease of ceded lands at the Honolulu International Airport); (2) Hilo Hospital patient services receipts; (3) receipts from the Hawai'i Housing Authority and the Housing Finance and Development Corporation for projects situated on ceded lands; and (4) interest earned on withheld revenues. On May 7, 1996, OHA moved for partial summary judgment on each of its aforementioned claims.

In response, the State moved to dismiss the case on the grounds of sovereign immunity, lack of justiciability, waiver/estoppel, and statute of limitations. After hearing oral argument on the motions, the circuit court orally denied the State's motion to dismiss and granted OHA's motions for partial summary judgment, concluding that OHA was entitled to revenues from each enumerated source. On October 24, 1996, the circuit court entered an order denying the State's motion to dismiss and an order granting OHA's motions for partial summary judgment.

Subsequent to the ruling, the circuit court stayed further proceedings and authorized this interlocutory appeal. The State filed its notice of appeal on November 22, 1996.

## C. *Relevant Subsequent History*

Following the completion of briefing in the instant appeal, the State notified this court that Governor Benjamin Cayetano had signed Act 329 into law on June 30, 1997. *See* 1997 Haw. Sess. L. Act 329, at 956. Section 2 of Act 329 (codified at HRS § 10–13.3 (Supp.2000)) added a new section to Chapter 10 that reads:

> **Interim revenue.** Notwithstanding the definition of revenue contained in this chapter and the provisions of section 10–13.5, and notwithstanding any claimed invalidity of Act 304, Session Laws of Hawaii 1990, the income and proceeds from the pro rata portion of the public land trust under article XII, section 6 of the state constitution for expenditure by the office of Hawaiian affairs for the betterment of the conditions of native Hawaiians for each of fiscal year 1997–1998 and fiscal year 1998–1999 shall be $15,100,000.

1997 Haw. Sess. L. Act 329, at 958. In section 1 of Act 329, the legislature acknowl-

edges the instant appeal and attempts to establish a "mechanism . . . for the resolution of all outstanding issues between the executive and legislative branches and [OHA] outside of the litigation process and which involves representatives of each." 1997 Haw. Sess. L. Act 329, at 957. Further, section 1 of Act 329 states:

> It is in the public interest that the relevant issues relating . . . but not limited to issues currently under litigation between the state and [OHA], be addressed within and remain under the control of the executive and legislative branches of state government as essentially political questions within the spirit of the Supreme Court of Hawaii's opinion in *Office of Hawaiian Affairs v. Yamasaki*, 69 Haw. 154 [737 P.2d 446] (1987).[6]

1997 Haw. Sess. L. Act 329, at 957. The State essentially contends that section 1 of Act 329, effective July 1, 1997, removes this case from judicial scrutiny because it "confirms the Legislature's intent that disputes between OHA and the State be resolved by the Legislature and not in the courts."

Another subsequent development has become relevant to this appeal. On December 10, 1997, the State, pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(j) (1995),[7] submitted supplemental authority— *i.e.*, the subsequent federal legislation, Department of Transportation and Related Agencies Appropriations Act, Pub.L. No. 105–66, § 340, 111 Stat. 1425, 1448 (1998) [hereinafter, the Forgiveness Act]—which the State believes governs this court's construction of Act 304 as codified at HRS § 10–2. · Specifically, the State brought to this court's attention the following provisions in the Forgiveness Act:

> [C]ontrary to the prohibition against diverted airport revenues from airport pur-

poses under Section 47107 of title 49, United States Code, certain payments from airport revenues may have been made for the betterment of Native Hawaiians, or Alaskan natives based upon the claims related to lands ceded to the United States. . . . *There shall be no further payment of airport revenues for claims related to ceded lands, whether characterized as operating expenses, rent, or otherwise, and whether related to claims for periods of time prior to or after the date of the enactment of this Act.*

Letter from Attorney General [on behalf of the State] to Chief Clerk, Supreme Court of Hawai'i of 12/10/97 at 1 (citing Pub.L. No. 105–66, § 340, 111 Stat. at 1448).

In light of the subsequent federal legislation and the fact that the Honolulu International Airport (the Airport) sits—at least partially—on ceded land, this court is charged with the task of determining whether the Forgiveness Act impacts the interpretation of Act 304 and HRS § 10–2. OHA contends that, rather than extinguishing the State's duty to pay *any* monies to OHA in connection with the lease of ceded land at the Airport, the following savings clause in the Forgiveness Act requires the State to pay the past due amounts from a different funding source:

> CLARIFICATION—Nothing in this Act shall be construed to affect any existing Federal statutes, enactments, or trust obligations created thereunder, or any statute of the several States that defined the obligations of such States to Native Americans, Native Hawaiians or Alaska natives in connection with ceded lands, except to make clear that airport revenues may not be used to satisfy such obligations.

Forgiveness Act, § 340(d), 111 Stat. at 1448. In further support of its proposition, OHA

---

**6.** As previously stated, this court, in *Yamasaki*, concluded that the construction of the term "funds," which was later amended to the term "revenue," constituted a non-justiciable political question because the legislature had not provided judicially manageable standards. 69 Haw. at 172–73, 737 P.2d at 457.

**7.** HRAP Rule 28(j) provided as follows:

**Citation of Supplemental Authorities.** Parties may, by letter to the clerk of the court, bring to the court's attention pertinent and

significant authorities published after a party's brief has been filed, but before a decision. A copy of the letter, setting forth the citations, shall be served at or before the time of filing as provided by Rule 25(b) of these rules. The letter shall provide references to either the page(s) of the brief or to a point argued orally to which the citations pertain. The letter shall, without argument, state the reasons for the supplemental citations. Any response shall be made promptly and shall be similarly limited.

also points to HRS § 10–5(1) (1993), which states that OHA's board of trustees has the power to "[m]anage, invest, and administer . . . all moneys received by the office *equivalent to that pro rata portion*" derived from the ceded lands. *See also* HRS § 10–13(b) (1993) (also using "equivalent to" language).

The State, however, contends that the Forgiveness Act indirectly extinguishes the State's duty to pay any monies from airport revenues because money from an alternative source would not be "derived" from the Airport as required by HRS § 10–13.5. Alternatively, the State argues that the Forgiveness Act fatally conflicts with Act 304, and that Act 304, therefore, by its own terms, is effectively repealed. If repealed, this court would then left in the position it was at the time of *Yamasaki.*

## II. *STANDARD OF REVIEW*

With respect to statutory construction, this court has held:

> The interpretation of a statute . . . is a question of law reviewable *de novo.* Furthermore, our statutory construction is guided by established rules:
>
>> When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.
>>
>> When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.
>>
>> In construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared in order to ascertain their true meaning. HRS § 1–15(1) (1993). Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

> This court may also consider the reason and spirit of the law, and the cause which induced the legislature to enact it to discover its true meaning. HRS § 1–15(2) (1993). Laws in *pari materia,* or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another. HRS § 1–16 (1993).

*State v. Cullen,* 86 Hawai'i 1, 8–9, 946 P.2d 955, 962–63 (1997) (quotation marks, brackets, ellipses, and some citations omitted).

## III. *DISCUSSION*

As previously indicated, OHA seeks, *inter alia,* its pro rata share of airport revenue under HRS §§ 10–2 and 10–13.5, as amended by Act 304. The State contends that federal law—specifically, the Forgiveness Act—prohibits the payment of airport revenue to OHA. Because section 16 of Act 304 provides that the entire act is invalid if this court determines that a conflict exists between federal law and the provisions of Act 304, we need to examine whether such conflict exists, insofar as our ability to review the substance of this appeal is dependent upon the validity of the act.

Preliminarily, however, we recognize that the provisions of Act 304 do not *expressly* provide for payment of airport revenues to OHA. Thus, at first glance, no conflict between the Forgiveness Act and the application of Act 304 is readily apparent. However, HRS § 10–13.5, as amended by Act 304, provides for payment of twenty percent of all revenue derived from ceded lands to OHA. Because the Airport sits, at least partially, on ceded lands, we must first examine whether OHA is entitled to the airport revenues it seeks under Act 304, and, if so, whether the payment of such revenues conflicts with federal law.

### A. *OHA's Entitlement to Payment of Airport Revenue Under Act 304*

In the case before us, OHA seeks its pro rata share of revenues that the State receives pursuant to its lease [8] of airport premises to the duty free concessionaire [hereinafter, DFS]; specifically, OHA seeks the

8. From January 1, 1981 through June 30, 1997,     the State and DFS have entered into various In-

revenues that are based on gross receipts from the Waik;ik;i Duty Free Store (WDF).[9] The State argues that the portion of the rent received from DFS that is based upon the receipts from WDF does not result from activity "situated upon" or from "actual use of" the ceded lands and is, therefore, not "derived from" ceded lands. We disagree.

Under the plain language of HRS § 10–2, as amended by Act 304, "revenue" includes, *inter alia*, "all ... rents ... derived from any ... lease ... result[ing] from the actual use of [ceded] lands[.]" *See* HRS § 10–2. Thus, to the extent that the State leases premises to DFS that are situated upon ceded lands, OHA would be entitled to the equivalent of twenty percent of the rent charged. According to the DFS Lease Agreements, the rental amount charged is equal to the greater of: (1) a minimum annual guaranteed rental; or (2) the sum of twenty percent of the lessee's "gross receipts."

Under the agreement, "gross receipts" includes "all receipts" derived or received by DFS as a result of its operation of the concession and "the exercise of the right to deliver [duty free] merchandise to the Airport regardless of whether the ... entire transaction takes place at the Airport or only a portion thereof takes place at the Airport[.]" The fact that the amount of rent due may be calculated by the total of receipts received by DFS, including those receipts from WDF, does not change the fact that the rent paid is for the "actual use" (*i.e.*, the lease) of the Airport premises. Were that not true, the State, itself, would have no basis for collecting any money from DFS that is derived from WDF receipts.[10] Accordingly, under HRS § 10–2, as amended by Act 304, OHA is entitled to twenty percent of the rent paid for its lease or use of that portion of the Airport premises situated on ceded land,[11] irrespective of whether that

bond (Duty Free) Concession lease agreements: Lease No. DOT–A–80–19 (from January 1, 1981 to June 30, 1988); Lease No. DOT–A–88–1 (from July 1, 1988 to May 31, 1993); and Lease No. DOT–A–92–13 (from June 1, 1993 to June 30, 1997).

9. WDF is a "dummy" outlet physically located in Waik;ik;i. DFS has the right to "deliver to the Airport" duty-free merchandise, purchased by eligible departing passengers at an outlet outside the Airport, "provided that: (a) It shall be clearly designated as an in-bond (duty free) outlet or a 'dummy' store." Lease No. DOT–a–80–19.

10. Although not clearly articulated, the State seems to argue that the State's contract is for rent *as well as* the exclusive right to sell duty free goods, a right "conferred by the State not as landlord, but as sovereign." State's Reply Brief at 18. *See also* HRS § 261–7(c) (authorizing the Department of Transportation to enter into a contract "with no more than one person" for the sale and delivery of duty-free goods to the Airport"). However, it is unclear from the record that the State contracted with DFS for anything other than the lease of the premises. Furthermore, any portion of *the rent* that was based on the exclusive right to sell duty free goods (even if conferred by the State as sovereign) would still constitute "proceeds, fees, charges, rents or other income ... *derived from [a] lease, ... result[ing] from the actual use [i.e., lease] of [trust lands]*." *See* HRS § 10–2 (emphasis added). In other words, it is through its lease of the Airport premises that the State derives payment from DFS for the "exclusive right to sell duty free goods." We express no opinion as to whether the State could charge DFS, by means other than its lease of the Airport premises, based on its

sovereign authority (as opposed to its lease of land) without triggering the applicability of HRS § 10–2.

11. The State also argues for the first time on appeal that income from improvements upon ceded lands is not revenue derived from the use thereof. Given the plain language of the statute and the State's prior conduct, we cannot agree. HRS § 10–2 essentially provides that any monies derived from *any use or activity* that is *situated upon or results from* ceded lands is "revenue" for the purposes of HRS § 10–13.5. Any further doubt about whether "revenue" under the statute includes improvements is removed by simply examining the list of exceptions, most but not all of which are derived from improvements and activities upon the land rather than from the land itself. For example, the list includes: monies received from any public educational institution such as tuition, registration fees, meals, books, grants, or scholarships. *See* HRS § 10–2. If the legislature had intended that all revenues from improvements not be included in the definition of revenue itself, it would not have needed to specifically exclude any sources of "improvement revenue" from the definition. No distinction is apparent in the statute between revenue from land, on the one hand, and revenue from improvements thereon, on the other. Moreover, the State's past conduct suggests that, prior to this appeal, it has always considered that "revenue" under the statute includes revenue from improvements upon the land. Nothing in the record suggests that the State believed that revenue was limited to activities such as "grazing, logging, and mining," as asserted in the State's opening brief. In fact, pursuant to the statute,

rent is calculated at a flat rate or is based on DFS receipts, including those from WDF. In other words, Act 304 obligates the State to pay to OHA the airport revenues sought in this case. We now address whether federal law precludes the payment of airport revenue to OHA.

## B. Whether Federal Law Precludes the Payment of Airport Revenues to OHA

In 1982, Congress enacted the Airport and Airway Improvement Act of 1982, Pub.L. No. 97–248, § 511(a)(12), 96 Stat. 671, 687 (1982) (codified, as subsequently amended, at 49 U.S.C. § 47107(b)(1)), which directed all airport owners to use "all revenues generated by the airport . . . for the capital or operating costs of the airport, the local airport system, or other local facilities which are owned or operated by the owner or operator of the airport and directly related to the actual transportation of passengers or property[.]" In 1994, Congress specified that the "use of airport revenues for general economic development, marketing, and promotional activities unrelated to airports or airport systems" was prohibited. Federal Aviation Administration (FAA) Authorization Act of 1994, Pub.L. No. 103–305, § 112(a)(2)(B), 108 Stat. 1569, 1574–75 (1994) (codified at 49 U.S.C. § 47107(l)(2)(b)).

■ The State, in its opening brief, argues that the aforementioned federal law bars the State from using monies derived from the State's airport system to pay OHA.[12] However-er, in making payments to OHA from airport revenues, the State had previously justified the payments as a form of ground rent and, therefore, deemed such payments as an excludable airport-related expenditure. In 1995, the federal Department of Transportation (DOT) conducted an investigation into the propriety of the State's payments to OHA from airport revenues. In a 1996 report, the DOT Inspector General (IG) concluded that the payments "were a diversion of airport revenue in violation of 49 § U.S.C. 47107(b)." FAA Report No. R9–FA–6–015, Airport Improvement Program Grants Provided to the Hawaii Department of Transportation, at 11 (Sept. 19, 1996).

As a result, the IG recommended that the FAA "withhold payments on current grants and approval of further grants[ ] if the [State] does not: [ ] recover the $28.2 million in airport revenues paid to OHA for nonairport purposes[.]" Id. at 14–15. In April 1997, the FAA announced that it concurred in the IG's finding and recommendation. Memorandum from FAA Acting Administrator to Acting Inspector General of 4/25/97, at 1.[13]

In response, Congress enacted the Forgiveness Act, which provides in relevant part:

(7) [C]ontrary to the prohibition against diverted airport revenues from airport purposes under Section 47107 of title 49, United States Code, *certain payments from airport revenues may have been*

the State has paid OHA a pro rata share of revenues from such sources as airport landing fees, parking revenues, and concession fees, all of which are based upon improvements constructed upon ceded lands.

12. In its answering brief, OHA argues that the State is precluded from raising this argument because it failed to raise it before the circuit court. The State counters that the issue *was* raised before the circuit court, but cites an amicus brief that was filed on November 14, 1996, after the circuit court entered its October 24, 1996 order granting OHA's motion for partial summary judgment and before the November 27, 1996 order granting the State's motion for leave to file an interlocutory appeal. Although, generally, matters not raised at trial may not be considered on appeal, "the rule is not inflexible[;] . . . an appellate court may deviate and hear new legal arguments when justice requires." *Fujioka v. Kam*, 55 Haw. 7, 9, 514 P.2d 568, 570 (1973).

Because the effect of the Forgiveness Act is purely a question of law, the outcome of which will affect the integrity of the circuit court's findings of fact, and is a matter of great public import, we will exercise our discretion in addressing the matter. *See id.* Moreover, this issue has been fully briefed on appeal. *See* State of Hawaii's Second Supplemental Brief filed March 2, 1998, OHA's Second Supplemental Brief filed March 2, 1998, and Brief of Amicus Curiae Airlines Committee of Hawaii, Inc., filed March 12, 1997.

13. On May 28, 1997, the State moved to have this court take judicial notice of the FAA's concurrence with the IG's recommendations. By order dated May 28, 1997, this court denied the motion. However, given its newfound relevance due to having precipitated the enactment of federal legislation, we now take judicial notice of it and other relevant federal memoranda, regulations, and legislation cited herein. *See* Hawai'i Rules of Evidence (HRE) Rules 201 and 202.

*made for the betterment of Native Hawaiians,* or Alaskan natives *based upon the claims related to lands ceded to the United States* [.]

. . . .

(b) TERMINATION OF REPAYMENT RESPONSIBILITY.—Notwithstanding the provisions of 47107 of title 49, United States Code, or any other provision of law, *monies paid for claims related to ceded lands and diverted from airport revenues and received prior to April 1, 1996,* by any entity for the betterment of Native Americans, Native Hawaiians, or Alaska Natives, *shall not be subject to repayment.*

(c) PROHIBITION ON FURTHER DIVERSION.—*There shall be no further payment of airport revenues for claims related to ceded lands,* whether characterized as operating expenses, rent, or otherwise,. and whether related to claims for periods of time prior to or after the date of the enactment of this Act.

(d) CLARIFICATION—*Nothing in this Act shall be construed to affect* any existing Federal statutes, enactments, or trust obligations created thereunder, or any statute of the several States that define *the obligations of such States to* Native Americans, *Native Hawaiians* or Alaska natives *in connection with ceded lands, except to make clear that airport revenues may not be used to satisfy such obligations.*

Department of Transportation and Related Agencies Appropriations Act, 1998, Pub.L. 105–66, § 340, 111 Stat. 1425 (1998) (emphases added).

The plain language of the Forgiveness Act clearly prohibits the payment of airport revenues to OHA—"whether characterized as operating expenses, *rent or otherwise,* and whether related to [past, present or future] claims"—in satisfaction of the State's obligations.

Although Congress does not have the power to instruct this state on how to expend its own funds, Congress does have the authority to condition the use of federal funds. *See South Dakota v. Dole,* 483 U.S. 203, 206–08, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) (explaining that, consistent with the constitutional limitations on Congressional powers, pursuant to article I of and the tenth amendment to the United States Constitution, Congress, under its spending power, may attach conditions on the receipt of federal funds provided that the conditions themselves are not unconstitutional). Assuming arguendo that the Forgiveness Act represents a valid condition on the receipt of federal airport funds, we must determine whether the condition that airport revenues not be paid to OHA conflicts with the provisions of Act 304.

C. *Section 16 of Act 304*

■ As previously indicated, Act 304 provides for payment of airport revenues to OHA, and the Forgiveness Act precludes the payment of airport revenues to OHA. Thus, the provisions of Act 304, as applied in this case, conflict with provisions of federal law. Section 16 of Act 304 provides

> The provisions of this Act shall be enforced to the extent that they are not held to conflict with any federal or state law, rules, or regulations. The provisions of this Act are not severable and *if any provision of the Act,* **or the application thereof** *to any person or circumstances is held to conflict with any federal or state law, rules, or regulations, this Act, in its entirety, shall be invalid* and sections 10–2, 10–3, 10–5, 10–13 and 10–13.5, Hawaii Revised Statutes, shall be reenacted in the form in which they read on the day before the approval of this Act.

1990 Haw. Sess. L. Act 304, § 16 at 953 (emphases added). Accordingly, by its own terms, Act 304 appears invalid.

■ OHA, however, maintains that Act 304 is not in conflict with the Forgiveness Act because the savings clause in the Forgiveness Act and the "equivalent to" language in HRS chapter 10 dictate that the State pay the past due amounts from a different funding source. Notwithstanding the fact that Congress cannot dictate this court's construction of state statutes, the plain language of the savings clause does not support the construction that OHA suggests in this case. The savings clause states in relevant part:

> Nothing in this Act ·shall be construed to affect any existing . . . statute of the several States that defined the obligations of such states to native Hawaiians in connection with ceded lands, *except to make clear*

*that airport revenues may not be used to satisfy such obligations.*

Forgiveness Act, § 340(d), 111 Stat. at 1448 (emphasis added). In other words, the savings clause provides that state statutes shall not be interfered with, *except* where those statutes provide for payment of airport revenues to satisfy the State's obligations. Because Act 304 obligates the State to pay airport revenues to OHA in this case, the savings clause cannot "save" Act 304.

Additionally, the "equivalent to" language, upon which OHA relies,[14] does not support the contention that the State is obligated to pay amounts "equivalent to" the airport revenue due to OHA from other sources, such as the general fund. First, HRS § 10-5(1), as amended by Act 304, confers the power upon OHA's Board of Trustees to manage "all moneys received by [OHA] **equivalent to** that pro rata portion of the revenue ... referred to in section 10-2[.]" (Emphases added.); *see also* HRS § 10-13(b) (also amended by Act 304 to add the "equivalent to" language). When enacting Act 304, the legislature contemplated making a substantial payment to OHA from the state's general obligation bond fund for the purpose of satisfying the state's retroactive obligation to OHA. *See* 1990 Sess. L. Haw. Act 304 at 951–

52. The legislature ultimately paid OHA approximately 130 million dollars from this fund. *See* 1993 Sess. L. Haw. Act 35, at 41. Although this payment was not "revenue derived from the public land trust," it was in satisfaction of the State's obligation to pay OHA "revenue derived from the public land trust[.]"[15] *See* HRS § 10-13.5. By adding the "equivalent to" language to HRS §§ 10-5 and 10-13, the legislature clarified that the general obligation bond fund revenue paid to OHA was income that the OHA board of trustees was authorized to manage, invest and administer, as though it were payment for OHA's share of ceded lands revenue. In other words, the "equivalent to" language was meant to instruct the management of funds in the event that the legislature *appropriated* money from other sources in satisfaction of its obligation to OHA. Thus, although the "equivalent to" language, added pursuant to Act 304, does serve an important purpose, it does not serve to appropriate funds from other sources, such as the general fund, in the event that payment of airport revenue was deemed prohibited by federal law, rules, or regulations.

Second, when enacted, HRS § 10-13.5 was considered an appropriation.[16] In so "appropriating," the legislature contemplated pay-

---

14. Specifically, OHA points to HRS § 10-5(1) (1993) which gives the trustees the power to:

Manage, invest, and administer the proceeds from the sale or other disposition of lands, natural resources, minerals, and income derived from whatever sources for native Hawaiians and Hawaiians, including all moneys received by the office **equivalent to** that pro rata portion of the revenue derived from the public land trust[.]

HRS § 10-5(1) (emphasis added). OHA also cites HRS § 10-13(b) (1993) which provides in relevant part that:

[A]ll moneys received by the office **equivalent to** that pro rata portion of the revenue derived from the public land trust described in section 10-2, shall be credited to special or other funds[.]

HRS § 10-13(b) (emphasis added).

15. Indeed, on at least four different occasions, the legislature has chosen to pay OHA its pro rata share of ceded land revenue pursuant to HRS §§ 10-12 and 10-13.5 by appropriating sums from the general fund. *See* 1990 Sess. L. Haw. Act 304, § 11 at 952 (appropriating out of general revenues the sum of $7,200,000 "to provide funds pursuant to sections 10-2 and 10-13.5"); 1992 Sess. L. Haw. Act 300, § 5(164) at

831 (appropriating out of the general fund $5,000,000 "to partially satisfy and pay to [OHA], the amount [owed, pursuant to Act 304,] for the period from June 16, 1980 through June 30, 1991"); 1993 Sess. L. Haw. Act 35, § (appropriating general obligation bond funds for payment to OHA in a sum not to exceed $136,500,000 for revenues owed pursuant to Act 304); 1997 Sess. L. Haw. Act 329, § 2 at 958 (enacting HRS § 10-13.3, which states that "[n]otwithstanding the definition of revenue contained in this chapter and the provisions of section 10-13.5 ... the income and proceeds from the pro rata portion of the public land trust ... for each of fiscal year 1997–98 and fiscal year 1998–1999 shall be $15,100,000.").

16. When HRS § 10-13.5 was enacted, it was referred to as a "funding mechanism," "a source of funds," and an "appropriation." *See* Testimony of Representatives Sutton and Holt on Conf. Comm. Rep. No. 98-80, in 1980 House Journal, at 1016–17 and Testimony of Senators Ajifu and O'Connor on Conf. Comm. Rep. 97-80, in 1980 Senate Journal at 881–82. Moreover, it is clear from the legislative history that the impetus behind enacting HRS § 10-13.5 was to fund OHA so that OHA was not required to seek funding

ment to OHA from the funds actually derived from ceded lands. Indeed, as Congress noted in the Forgiveness Act, the State has, in the past, paid OHA directly from the airport revenue fund. Had the legislature instead contemplated paying an amount from other sources, such as the general fund, that is "equivalent to" that received into the airport revenue fund, the legislature would likely be abdicating its constitutional and statutory duty to control the public fisc, *see* Haw. const. Art. VII §§ 5 and 9; *cf.* HRS § 37–93 (1993),[17] because the legislature cannot know or control how much airport revenue will be due to OHA in any given year. Furthermore, we believe that, when enacting Act 304, the legislature also contemplated that an intervening federal or state law (or rule or regulation) might conflict with the application of the act. The legislature, therefore, implemented section 16 to ensure the matter would return to the legislature for resolution by providing that "sections 10–2, 10–3, 10–5, 10–13 and 10–13.5, Hawaii Revised Statutes, shall be reenacted in the form in which they read on the day before the approval of this

Act." 1990 Haw. Sess. L. Act 304, § 16 at 953. Relying on this court's decision in *Yamasaki, supra,* the legislature obviously anticipated that the reinstatement of the pre-Act 304 statutory versions, which were explicitly addressed in *Yamasaki,* would most likely result in the same or similar ruling, *i.e.,* lack of justiciability. Consequently, we do not believe the "equivalent to" language in HRS §§ 10–5 and 10–13 can be interpreted to obligate payment from other sources, such as the general fund, without the legislature's express consideration and appropriation of those funds.

Based on the foregoing, we hold that Act 304, as applied to the airport revenue sought in this case, conflicts with the provisions of the Forgiveness Act. As such, by its own terms, Act 304 is invalid.

### D. *Justiciability*

■ In the case before us, OHA seeks its pro rata share of specific revenues owed by the State pursuant to HRS §§ 10–13.5 and 10–2, as amended by Act 304.[18] Necessarily,

---

from the legislature every year. *See* Testimony of Representative Holt, *supra* ("The [percentage] formula for this pro rata trust fund money is set under this bill so that funding for OHA is accomplished by operation of law and OHA need not come back each year for legislative appropriation."); Testimony of Representative Sutton, *supra* ("[T]his bill insures that 20 percent of the income from ceded public land is to serve as the source of funds and revenue which will be used and held solely by OHA[.]"); Testimony of Representative Kamalii on Conf. Comm. Rep. No. 98–80, in 1980 House Journal, at 1015 ("[T]he setting of the 20 percent pro rate share of the public lands trust as the rightful means to fund [OHA] is a significant affirmation of the mission of OHA."); *see also* Testimony of Senator Ajifu, *supra* ("I am opposed to [the bill] because of the method of funding for [OHA]. I believe we, as legislators, are relinquishing our responsibilities by providing appropriation in this manner.").

17. HRS § 37–93 (1993) provides in relevant part:

(a) The legislature shall not make appropriations from the general fund for each fiscal year of the biennium or each supplementary budget fiscal year which will exceed the expenditure ceiling for that fiscal year.

(b) Notwithstanding the prohibition in subsection (a), the legislature may make appropriations from the general fund in excess of those allowed by subsection (a) by:

(1) A two-thirds vote of the members to which each house of the legislature is entitled;

(2) Setting forth the dollar amount and the rate by which the appropriations allowed by the change in the state growth will be exceeded; and

(3) Setting forth the reasons for exceeding the appropriations allowed by the percentage change in the state growth;

in each act which will cause appropriations from the state general fund to exceed those allowed by the change in state growth.

18. Although OHA relies extensively on trust doctrines and the fiduciary duty owed by the State to native Hawaiians to demonstrate that the money is owed and that failure to pay constitutes not only a violation of the statute, but also a violation of the State's fiduciary duty, the substance of this dispute, as presented, is based on the provisions of HRS §§ 10–2 and 10–13.5 and, thus, does not require an analysis of the State's fiduciary obligation. The State's fiduciary duty is owed not only to native Hawaiians, but also to the general public. Haw. Const. art. XII, § 4. Although HRS § 10–13.5 was enacted as a means of meeting the State's trust obligation to native Hawaiians, it was never intended by the legislature to be the sole means of satisfying that obligation. *Yamasaki,* 69 Haw. at 165, 737 P.2d at 453. Therefore, noncompliance with HRS § 10–13.5 does not equate to a per se breach of the State's fiduciary duty, nor does compliance with HRS § 10–13.5 equate to a per se satisfaction of that

then, the merits of OHA's case are dependent upon the validity of Act 304. Moreover, the circuit court granted summary judgment in favor of OHA based, almost exclusively, on its interpretation of HRS § 10–2, as amended by Act 304. Not surprisingly, the absence of the definition of "revenue," as a result of the invalidation of Act 304, is fatal to the circuit court's grant of summary judgment in this case.

Additionally, and perhaps more fundamentally, the invalidity of Act 304 reinstates the immediately preceding version of HRS §§ 10–2 and 10–13.5, which then places this court precisely where it was at the time *Yamasaki* was decided. In *Yamasaki*, this court determined the issues presented in this intragovernmental dispute to be nonjusticiable due to the lack of judicially discoverable and manageable standards for determining the specific revenues to which OHA was entitled to receive under HRS § 10–13.5. *Yamasaki*, 69 Haw. at 175, 737 P.2d at 458. More specifically, we stated

> Inasmuch as section 10–13.5 simply states "[t]wenty per cent of all funds derived from the public land trust, described in section 10–3, shall be expended by the office; as defined in section 10–2, for the purposes of this chapter[,]" the task at

first sight appears to be one of statutory interpretation. But a closer look at the disputes reveals they do not constitute traditional fare for the judiciary; and if the circuit court ruled on them, it would be intruding in an area committed to the legislature. It would be encroaching on legislative turf because the seemingly clear language of HRS § 10–13.5 actually provides no "judicially discoverable and manageable standards" for resolving the disputes and they cannot be decided without "initial policy determination[s] of a kind clearly for nonjudicial discretion." *Baker v. Carr*, 369 U.S. [186] at 217, 82 S.Ct. [691] at 710 [7 L.Ed. 2d 663 (1962)].

When the constitutional mandate for the establishment of a government agency with a primary goal of "the betterment of the conditions of native Hawaiians" was implemented in 1979, the legislature acknowledged that "much [was] left to subsequent legislatures, the Office of Hawaiian Affairs, and its board of trustees to work out the appropriate boundaries of the public trust." Stand. Comm. Rep. No. 784, in 1979 Senate Journal, at 1353. A year later, when OHA's share of funds from the trust was fixed at twenty per cent, its "boundaries" were still undetermined. *Yamasaki*, 69 Haw. at 172–173, 737 P.2d at 457.[19]

duty. Moreover, to the extent that the legislature intended or professed to broadly grant revenues to OHA in HRS § 10–13.5 as *a* means of satisfying the State's obligation, but effectively repealed its means of implementing that statute, this court cannot judicially legislate more for OHA, on behalf of native Hawaiians, than the legislature plainly allotted. Notably, OHA does not argue that the statute violates article XVI, section 7 of the Hawai'i Constitution on the grounds that it "diminishes or limits" the benefit to native Hawaiians as provided under article XII section 4.

19. This court went on to say:
    That "the appropriate boundaries of the ... trust" were not set was confirmed by the enactment of legislation with a purpose of providing funds "(1) to complete the inventory of, (2) to study the numerous legal and fiscal issues relating to the use of and, (3) to study the use and distribution of revenues from ceded lands." S.L.H.1982, c. 121, § 1. The legislative committee reports accompanying the measure are even more revealing. All four committees to which the bill was referred for study found there were uncertainties with respect to the ceded lands comprising the trust res and the funds derived therefrom. The committees concluded

that the many uncertainties surrounding the matter of ceded lands and the disposition of revenues generated by the use of ceded lands can best be resolved by ascertaining what and where ceded lands exist, the legal and fiscal problems which may exist or arise from their use, and the effect on all parties concerned with the use and distribution of revenues generated from ceded lands.
Stand.Comm.Rep. No. 396, in 1982 House Journal, at 1061; Stand.Comm.Rep. No. 663, in 1982 House Journal, at 1200; [69 Haw. 154, 737 P.2d 446] Stand.Comm.Rep. No. 565, in 1982 Senate Journal, at 1190; Stand.Comm. Rep. No. 768, in 1982 Senate Journal, at 1279. Hence, they recommended the appropriation of $100,000 to the Legislative Auditor for the project.
    The Auditor undertook the assigned tasks after the close of the legislative session. He submitted a progress report in 1983, reporting that the tasks had not been completed because "the work ... is enormous." Legislative Auditor of the State of Hawaii, Progress Report on the Public Land Trust 1 (1983). In his final report issued in December of 1986 the Auditor states the tasks were more difficult than envisioned and the uncertainties surrounding the

This court noted that a ruling on the issues presented "would be rendered possible only by an initial policy determination by the court of a kind normally reserved for nonjudicial discretion." *Id.* at 174–75, 737 P.2d at 458 (citing *Baker v. Carr*, 369 U.S. at 217, 82 S.Ct. 691). In the absence of any appropriate standards, we held that the issues presented were "of a peculiarly political nature and therefore not [suitable] for judicial determination." *Id.* at 175, 737 P.2d at 458. In other words, we held the issues presented to be nonjusticiable.

In the absence of the substantive definition of "revenue" provided in the now invalid Act 304, this court is again left with no judicially manageable standards by which to discern what specific funds OHA is entitled to receive under chapter 10, without making "an initial policy determination ... of a kind normally reserved for nonjudicial discretion." *Id.* at 174–75, 737 P.2d at 458 (citing *Baker v. Carr*, 369 U.S. at 217, 82 S.Ct. 691). Accordingly, we hold this case to be nonjusticiable.[20]

## IV. CONCLUSION

Based on the foregoing, we hold that Act 304, as applied to revenue derived from that portion of the Honolulu International Airport that sits upon ceded lands, conflicts with federal legislation. Therefore, Act 304—by its own terms—is effectively repealed. Consequently, in the absence of the substantive statutory amendments prescribed in Act 304, this court is left with no judicially manageable standards by which to determine whether OHA is entitled to the specific revenues sought in this suit. Accordingly, we reverse the circuit court's orders and dismiss this case for lack of justiciability.

Given our disposition of this case, and the context of its complexity, we would do a disservice to all parties involved if we did not acknowledge that the State's obligation to native Hawaiians is firmly established in our constitution. *How* the State satisfies that constitutional obligation requires policy decisions that are primarily within the authority and expertise of the legislative branch. As such, it is incumbent upon the legislature to enact legislation that gives effect to the right of native Hawaiians to benefit from the ceded lands trust. *See* Haw. Const. art. XVI, § 7. Although this court cannot and will not judicially legislate a means to give effect to the constitutional rights of native Hawaiians, we will not hesitate to declare unconstitutional those enactments that do not comport with the mandates of the constitution. At this juncture, we believe it fitting to quote then-state Senator Neil Abercrombie's prophetic statement to the legislature at the time HRS § 10–13.5 was first enacted:

> I fear that for those who are interested in seeing [OHA] move forward that they have won a Pyrrhic victory, that this is merely a skirmish in a very large battle.
>
> ... [A]lthough I would be delighted to say otherwise, I regret to say that I expect that the moment this passes into statute, there will be a suit and that the business of the Office of Hawaiian Affairs is, as a result, going to be tied up in court for God-knows how many years.

Testimony of Senator Abercrombie on Conf. Comm. Rep. No. 97–80, in 1980 Senate Journal, at 881–82. Now, more than twenty years later, as we continue to struggle with giving effect to that enactment, we trust that the legislature will re-examine the State's constitutional obligation to native Hawaiians and the purpose of HRS § 10–13.5 and enact legislation that most effectively and responsibly meets those obligations.

---

trust and funds derived therefrom cannot be resolved without further legislative action. *Yamasaki*, 69 Haw. at 173–74, 737 P.2d at 457–58.

**20.** In light of our disposition, we need not address the state's remaining arguments for dismissal based on sovereign immunity, waiver/estoppel, and statute of limitations. Furthermore, because the Forgiveness Act effectively removes this case from judicial scrutiny, we need not address the State's contentions with respect to Act 329, or the constitutionality thereof.